**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CHRISTIAN K. NARKIEWICZ-LAINE | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 50106 |
| | ) | |
| v. | ) | District Judge Reinhard |
| | ) | Magistrate Judge Mahoney |
| SCANDINAVIAN AIRLINES SYSTEMS | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO TRANSFER VENUE

Scandinavian Airlines Systems ("SAS"), for its Motion to Transfer Venue from the Northern District of Illinois's Western Division to the Eastern Division pursuant to 28 U.S.C.A. § 1404(a), states as follows:

### I.    BACKGROUND

On May 26, 2008, Plaintiff, *pro se*, filed an action against SAS in the Circuit Court of the Fifteenth Judicial Circuit, Jo Daviess County, Illinois, case number 08-SC-103. (Ex. A, Complaint). Plaintiff's *pro se* Complaint alleges, *inter alia*, that Plaintiff purchased a ticket from SAS for a flight from Dublin, Ireland to Helsinki, Finland via Copenhagen, Denmark, and that Plaintiff suffered damages as a result of a delay during this travel. Plaintiff's Complaint also alleges that he is entitled to reimbursement of funds allegedly paid for a different airline ticket he failed to use.

On June 17, 2008, SAS removed Plaintiff's action to the District Court for the Northern District of Illinois, Western Division. The basis for removal was that Plaintiff's cause of action arises under a treaty of the United States, namely, the Montreal Convention, and that the District Court therefore has original jurisdiction over this matter as it involves a federal question. Plaintiff has opposed removal, but the Court has yet to rule on this issue. For the reasons stated

below, SAS respectfully requests that this Court transfer this case to the Eastern Division of the District Court for the Northern District of Illinois.

## II.    STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C.A. § 1404(a).  A court deciding a § 1404(a) motion to transfer is limited to considering only those factors stated in the statute: the convenience of the parties, the convenience of the witnesses, and the interest of justice. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, n. 3 (7th Cir. 1986).  The convenience of the witnesses and parties is the most important § 1404(a) factor. *Avco Corp. v. Progressive Steel Treating, Inc*. 2005 WL 2483379 at *2 (N.D. Ill. 2005) (Conlon).  These factors must be considered "in light of all the circumstances of the case," and "the weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and therefore, is committed to the sound discretion of the trial judge." *Id*. at 219. "Less of a showing of inconvenience is needed for a § 1404(a) transfer than that for a *forum non conveniens* dismissal." *Id*. at 220.  Intracircuit transfers, the variety sought here, are not as problematic as intercircuit transfers. *Pettiford v. Lesher*, 89 F.3d 838 (7th Cir. 1996).  Thus, because SAS seeks an intracircuit transfer, as opposed to an intercircuit transfer or outright *forum non conveniens* dismissal, the burden is easily met.

## III.    ISSUES RAISED IN PLEADINGS

### a.  Allegations of Plaintiff's Complaint

Plaintiff alleges in his Complaint that he was scheduled to fly on March 6, 2008 aboard an SAS flight from Dublin to Copenhagen with a connection in Helsinki. (Ex. A, ¶¶ 3-4).  The purpose of this trip was for Plaintiff to perform compensated consulting work for the European

Centre for Architecture Art Design and Urban Studies. (Ex. A, ¶¶ 3-4). The flight from Dublin was delayed for nearly 1½ hours. (Ex. A, ¶ 6). SAS did not attempt to place Plaintiff on another carrier. (Ex. A, ¶ 6). Plaintiff alleges that he overheard SAS ground crew in Dublin state that the flight was delayed because the flight crew failed to appear. (Ex. A, ¶ 11). Ultimately, Plaintiff arrived at his destination 1½ hours late, and missed his meeting. (Ex. A, ¶ 9). He now seeks to be reimbursed for his airline ticket, his two-night stay in a Helsinki Hotel, his ground transportation in Helsinki, his meals in Helsinki, lost consulting fees from the European Centre for Architecture Art Design and Urban Studies, parking at O'Hare and gasoline for his trip from O'Hare to Galena, among other damages Plaintiff alleges he is entitled to pursuant to European Union law. (Ex. A).

Plaintiff also attached several Exhibits to his Complaint. Exhibits B, C, D, and K to Plaintiff's Complaint are correspondence between Plaintiff and SAS's New Jersey Office. Exhibit E is a letter from Plaintiff to SAS in which Plaintiff identifies himself as Director/President of the Chicago Athenaeum, which per the letterhead maintains offices in Schaumburg (in the Eastern Division) as well as Galena. Plaintiff's Exhibit A is an Electronic Ticket Itinerary dated March 4, 2008, which reflects as its place of issue New York City.

### b. SAS's Answer and Affirmative Defenses

SAS does not dispute that Plaintiff purchased the subject tickets as he alleges, and does not dispute that his flight from Dublin was delayed. (Ex. B, Answer and Affirmative Defenses). However, SAS does dispute much of Plaintiff's Complaint. For example, SAS denies that Plaintiff's flight was delayed because the flight crew arrived late. (Ex. B, ¶ 11). SAS also denies that it breached its contract with Plaintiff, and denies that Plaintiff is entitled to any damages. (Ex. B). Additionally, SAS intends to produce evidence in support of its 10 Affirmative

Defenses, some of which include: (1) that SAS took all reasonable measures to avoid the alleged damages, pursuant to the Montreal Convention; (3) that Plaintiff's claim is barred by the governing Conditions of Carriage; (5) that the delay was caused by SAS's compliance with applicable standards and regulations; (7) that Plaintiff failed to mitigate his damages; (8) that third parties are responsible for Plaintiff's damages; and (10) that SAS fully complied with the terms of the parties' contract. (Ex. B).

## IV.    DISCUSSION

### a.  Convenience of Parties and Witnesses

The court analyzes the convenience of the parties and witnesses, which is the most important § 1404(a) factor, by looking at four prongs: "(1) plaintiff's choice of forum; (2) the site of material events; (3) availability of evidence in each forum; and (4) the parties' convenience in litigating in the respective forums." *Avco Corp. v. Progressive Steel Treating, Inc.*, 2005 WL 2483379 (N.D. Ill. 2005) (Conlon).

### 1.    The Plaintiff's Initial Forum Choice

While Plaintiff's choice of forum is generally entitled to significant weight, this weight is lessened when the initial forum bears a relatively weak connection to the facts underlying the lawsuit. *Id*. Where the alleged conduct that gives rise to the lawsuit did not occur within the Plaintiff's choice of forum, the plaintiff's preference is of minimal value. *Chukwu v. Air France*, 218 F.Supp.2d 979, 989 (N.D. Ill. 2002) (Gettleman). The Plaintiff's choice of forum is also given less weight where the defendant's place of business is in the division into which the Defendant seeks transfer. *Avco* at *2. And, where a plaintiff's chosen forum is not his home forum, his choice is entitled to no weight whatsoever. *Houck v. Trans World Airlines*, 947 F.Supp. 373, 375 (N.D. Ill. 1996) (Alesia).

In the present case, Plaintiff's initial choice of forum is entitled to little, if any, weight. Plaintiff originally brought this action in the Circuit Court of Jo Daviess County.  The events underlying Plaintiff's Complaint have very little to do with the Western Division.  Apart from Plaintiff's purchase of the subject airline tickets from his home in Galena, no alleged event occurred within the Western Division.  The delay Plaintiff alleges occurred in Europe, and the ticket for which he seeks a refund was for travel solely within Europe.  Moreover, a significant portion of the damages Plaintiff alleges (compensation for meals, lodging, transportation, and loss of income) occurred in Europe.  In short, the breaches and damages alleged by Plaintiff occurred thousands of miles from Rockford, Illinois.  On the other hand, SAS maintains staff and offices at O'Hare International Airport, and conducts flight operations at O'Hare, which sits in the Eastern Division. (Ex. C, Brennan Aff.).  Even when passengers who reside in the Western Division contract for travel with SAS, they cannot depart from the Western Division; rather, they must travel to an airport utilized by SAS. (Ex. C).  Moreover, it appears that Plaintiff resides both in Galena and Chicago, and is employed by a Chicago museum. (Ex. D, Plaintiff's Chicago Athenaeum biography).  Furthermore, Plaintiff has litigated at least two cases within the Eastern Division: a civil case in the Circuit Court of Cook County (Ex. E, Electronic Docket) and a federal criminal case in the wherein Plaintiff pled guilty to making false statements to an FBI agent (Ex. F, Indictment; Ex. G, Plea Agreement).  Thus, the Eastern Division is also Plaintiff's home forum.  Plaintiff's choice of forum is therefore entitled to little, if any, weight in the Court's analysis.

### 2.      The Site of Material Events

As noted above, the majority of the events of which Plaintiff complains, including the alleged breach itself and the lion's share of damages, occurred in Europe.  Plaintiff will no doubt argue that, because he purchased his ticket from his home in Galena, a portion of the material events occurred in the Western Division.  However, the simple purchase of an airline ticket within the chosen forum does not provide good reason to deny transfer where the "gravamen of plaintiff's complaint" occurs elsewhere. *Chukwu v. Air France*, 218 F.Supp.2d 979, 989 (N.D. Ill. 2002) (Gettleman).  Here, the material events alleged occurred in Europe, a portion of Plaintiff's alleged damages (travel expenses from O'Hare) were sustained in the Eastern Division, and SAS maintains offices operates flights in the Eastern Division.  Thus, this factor favors transfer.

### 3.      Availability of Evidence in Each Forum

There is no relevant evidence located within the Western Division (whether Plaintiff purchased the subject tickets is not an issue), while some relevant evidence is located within the Eastern Division, and all evidence is more readily available in the Eastern Division.  SAS maintains its records with regard to ticket purchases, flights, delays, and customer service in Stockholm, Sweden. (Ex. C, Brennan Aff.).  Some records are available in New Jersey at the SAS North America headquarters. (Ex. C).  No records are kept within the Western Division. (Ex. C).  Additionally, the witnesses SAS intends to call to dispute Plaintiff's allegations and prove SAS's Affirmative Defenses include:

> (i)      Angela R. Schlossmacher, an SAS customer relations representative and resident of New Jersey, is anticipated to testify with regard to her communications with Plaintiff, the reason for the delay experienced by Plaintiff, whether SAS took all reasonable measures to avoid Plaintiff's alleged damages, SAS policies, and the terms and effect of the Conditions of Carriage;

(ii)    Sven Eric Persson, SAS's Regional Manager and resident of New Jersey, is anticipated to testify with regard to his communications with Plaintiff, the reason for the delay experienced by Plaintiff, whether SAS took all reasonable measures to avoid Plaintiff's alleged damages, SAS policies, the terms and effect of the Conditions of Carriage, SAS's practice of contracting with other airlines to operate joint routes, applicable laws and regulations, and SAS operations;

(iii)    Nancy Stellman, of SAS's Customer Relations department and a resident of New Jersey, is anticipated to testify with regard to the authenticity of relevant documents, such as the Conditions of Carriage, tickets, boarding passes, correspondence, etc.

(iv)    James P. Brennan, SAS's Director of Finance and Accounting for the Americas and a resident of New Jersey, is anticipated to testify with regard to SAS operations and policies, the terms and effect of the Conditions of Carriage, SAS's practice of contracting with other airlines to operate joint routes,

(v)    As yet unidentified flight operations personnel from Dublin International Airport who are anticipated to testify with regard to the reason for the delay of Plaintiff's flight, whether SAS employees or employees of other companies or agencies.

(Ex. C, Brennan Aff.). As discovery in this matter progresses and additional allegations are levied, SAS anticipates that additional witnesses may be required. In all likelihood, any additional witnesses will be from Europe, where SAS is headquartered and where it conducts the majority of its operations, or New Jersey, where SAS manages its U.S. operations. (Ex. C). These witnesses will require travel arrangements and lodging; as they will be flying into Chicago, it would be more convenient to litigate this matter in the Eastern Division.

While SAS is not privy to the evidence Plaintiff intends to present in support of his claims, there is certain evidence Plaintiff will require to prove his allegations. Many of the witnesses SAS listed above will be relevant to Plaintiff's claims; as noted, they reside in Europe or in New Jersey, and will be more inconvenienced if this case is tried in the Western District than if it is tried in the Eastern District. Additionally, Plaintiff claims a variety of damages; he

must bear the burden of proving such damages. Thus, Plaintiff will have to prove the existence
and nature of his relationship with the European Centre for Architecture Art Design and Urban
Studies, and show that he was not paid his consulting fees as a result of the delay. This will no
doubt require testimony and documentary evidence from the European Centre, which according
to Plaintiff, is located in Dublin. Plaintiff will also require testimony and documentary evidence
from Helsinki residents to establish his claims for hotel, meal and transportation expenses.

The documentary and testimonial evidence in this case is in Europe and the Eastern
Division; none is in the Western Division. Where evidence is not in the Eastern Division, it is
more readily available in the Eastern Division, where SAS maintains staff and offices, and where
SAS operates aircraft. (Ex. C). Thus, this factor strongly favors transfer. (*See Avco* at *3,
holding that, while evidence is located throughout the United States, where it is more readily
available in the Eastern District, this factor favors transfer).

### 4.    Parties' Convenience in Litigating in the Respective Forums

SAS maintains no offices or staff in the Western Division, but does maintain offices and
staff in the Eastern Division. For this reason alone, it is more convenient for SAS to litigate in
the Eastern Division. SAS anticipates that its representative at trial will be James P. Brennan,
who resides in New Jersey. It will be more convenient for Brennan to litigate in the Eastern
Division. (Ex. C). Also, it will be more convenient for SAS to arrange for its employee
witnesses to testify in Chicago. SAS regularly conducts business in Chicago, and has developed
relationships with Chicago companies that provide transportation and lodging. SAS has no such
relationships in Rockford. (Ex. C). SAS employee witnesses will also have workspace available
to them at SAS's Chicago offices. (Ex. C). It is thus clearly more convenient for SAS to litigate
this matter in the Eastern Division.

Plaintiff maintains a home in the Eastern Division, so any pleas of inconvenience from him should be disregarded. Even if Plaintiff does not maintain a home in the Eastern Division, the burden upon him to travel from Galena to Chicago, where he conducts business and has litigated prior cases, is less than the burden imposed upon SAS personnel to travel into Rockford, to which SAS has no connection. Thus, the convenience of the parties favors transfer to the Eastern Division.

### b. The Interest of Justice

The interest of justice analysis "focuses on the efficient administration of the court system, as opposed to the private consideration of the litigants." *Navarette v. JQS Property Maintenance*, 2008 WL 299084 at *3 (N.D. Ill. 2008) (Darrah). In weighing this factor, the court should consider "(1) the relative familiarity of the courts with the applicable law, (2) the relation of the respective forums with the issue in the case, (3) the relative congestion of the court dockets." *Id*. In cases of intra-district transfers, like the present case, this factor is given little weight. *Id*. Doubtless the Eastern Division and Western Division are equally competent to rule upon issues of treaty law, federal law, and to the extent implicated, Illinois and European law. The Eastern Division maintains a stronger relation to the issues in the case, though, because SAS maintains a place of business within the Eastern Division and conducts flights into and out of the Eastern Division on a daily basis. And, while the Eastern Division may handle more cases than the Western Division, there are also more district and magistrate judges assigned to the Eastern Division, so docket congestion is not a factor. To the extent this factor is entitled to any weight in the Court's intradistrict transfer analysis, it favors transfer to the Eastern District.

## V.    CONCLUSION

For the convenience of the parties and witnesses, and in the interest of justice, and for the reasons discussed above, transfer to the Northern District of Illinois, Eastern Division is appropriate.


WHEREFORE, Defendant, SAS, respectfully requests that this Honorable Court transfer this matter from the Northern District of Illinois, Western Division to the Northern District of Illinois, Eastern Division.

Respectfully submitted,

SCANDINAVIAN AIRLINES SYSTEMS

By:      s/Michael S. McGrory
One of Its Attorneys

Alan L. Farkas
Michael S. McGrory
Madsen, Farkas & Powen, LLC
20 S. Clark Street
Suite 1050
Chicago, Illinois 60603
T:  (312) 379-3444
F:  (312) 379-3443



IN THE CIRCUIT COURT OF DAVIESS COUNTY

CHRISTIAN K. NARKIEWICZ-LAINE            )
                                         )
            Plaintiff                    )        NO.  $08-SC-103$
                                         )
    vs.                                  )
                                         )        Damages Claimed: $8,693.27
SCANDINAVIAN AIRLINES SYSTEM             )        Plus Filing Fees and Attorney
                                         )        Fees if Applicable)
            Defendant                    )
                                         )        Return Date: June    ,2008

## COMPLAINT

Now comes Plaintiff Christian K. Narkiewicz-Laine, acting *pro see* as his attorney and in his defense and files the following complaint:

1. Plaintiff Christian K. Narkiewicz-Laine is a resident of the City of Galena, Illinois and in Jo Daviess County and resides at 760 Dewey Avenue, Galena, Illinois.

2. Scandinavian Airlines System (SAS) is multi-national airline and owned by SAS AB with operations and offices within the jurisdiction of the United States and in the State of Illinois at O'Hare International Airport; the State of Washington at Seattle-Tacoma International Airport; and the State of New Jersey at Newark Liberty International Airport at 9 Polito Avenue, Lyndhurst, New Jersey.

3. On March 6, 2008, Plaintiff, as an independent consultant, was sent to Helsinki, Finland by The European Centre for Architecture Art Design and Urban Studies in Dublin, Ireland to attend a meeting with other European Museums regarding a joint-venture exhibition inside Europe and the United States. Plaintiff is the Museum President of The Chicago Athenaeum: Museum of Architecture and Design in Galena, Illinois and often works as a special consulting curator for other international institutions and on international projects.

4. Plaintiff purchased a ticket via Internet on Scandinavian Airlines (Flight #SK538)

118.00
12.00
130.00

TT Cell# 815-777-4444

EXHIBIT
A

Dublin to Copenhagen and connecting on Scandinavian Airlines (Flight #SK712) Copenhagen to Helsinki in order to attend this meeting.  (EXHIBIT A)

5.    Plaintiff purchased this ticket on Scandinavian Airlines in Galena, Illinois at his home at 760 Dewey Ave. and paid for his ticket via Plaintiff's VISA credit card with the billing address of 760 Dewey Avenue.  Plaintiff purchased and paid for the ticket on his own behalf.

6.    Plaintiff arrived promptly at Dublin International Airport for the Scandinavian Airlines Flight #SK538, but found, after waiting over an hour inside the terminal, that the plane was delayed.  The plane was delayed for almost an hour and a half because it had been delayed repeatedly during the day at other locations and  was not following its scheduled arrival and departure times.  There were other flights on other  air carriers Dublin to Copenhagen and Dublin to Helsinki direct.  No attempt was made by Scandinavian Airlines to rebook Plaintiff on another air carrier in order for the Plaintiff to make  certain Plaintiff would make the connecting flight from Copenhagen to Helsinki or to arrive in Helsinki at the contracted time of 5:30PM.

7.    When Plaintiff finally boarded Scandinavian Airlines Flight #SK538, Plaintiff immediately realized that the air carrier was in fact NOT Scandinavian Airlines, but a mysterious "other" airline that the Plaintiff had never heard of.  That carrier is NOT part of the Scandinavian Airlines System and not a subsidiary, but an entirely different company than Scandinavian Airlines.  Plaintiff had no knowledge of this carrier; its ownership or safety or on-time record.

8.    Because of the hour plus delay at Dublin Airport, Scandinavian Airlines Flight #SK538 arrived late to Copenhagen causing Plaintiff to miss Plaintiff's connection (Scandinavian Airlines Flight  #712) to Helsinki.  Plaintiff was rescheduled on (Scandinavian Airlines Flight #1710) from Copenhagen to Helsinki.  When Plaintiff boarded this aircraft, Plaintiff understood again that this was not an aircraft belonging to the Scandinavian Airlines System, but yet another mysterious carrier Plaintiff has never heard of.

9.    The plane finally landed in Helsinki at 7:00PM and not the 5:30PM contracted time

causing Plaintiff to entirely miss the meeting that Plaintiff had been sent for by The European Centre for Architecture Art Design and Urban Studies to attend. By the time Plaintiff arrived to the meeting destination all the participants had been dispersed. Although Plaintiff tried to meet the following day, none of the participants were available. The entire trip was a waste of Plaintiff's professional time and money.

10. On April 2, 2008, Plaintiff wrote a letter to Scandinavian Airlines asking for a refund of the ticket in the amount of $484.64 and hotel in the amount of 555.60 Euro ($888.96) plus 330 DK ($69.21) for lunch and for the full amount of $1,442.87. (EXHIBIT B) Scandinavian Airlines rejected Plaintiff's request in a letter dated April 8, 2008 by Ms. Angela R. Schlossmacher, Customer Relations. (EXHIBIT C)

11. Plaintiff sent another letter on May 15, 2008 again requesting to be reimbursed with an answer to be given in seven days. (EXHIBIT K) Scandinavian Airlines sent another letter dated May 16, 2008 this time and now suddenly alleging "technical malfunction." Plaintiff overheard ground crew in Dublin state that the airplane was delayed because "flight crew did not show up." Scandinavian Airlines also suggested that Plaintiff investigate "private insurance" in order to claim losses, which is absurd and a outright admission of Plaintiff's damages and the airline's liability. (EXHIBIT D)

12. Additionally, on June 21, 2006, Plaintiff booked a ticket via Internet Dublin to Oslo on Scandinavian Airlines (Flight #SK4604) with a return on July 21, 2006 Oslo to Dublin (Flight #SK1467) in the amount of $278.73. (EXHIBIT E) Again, Plaintiff purchased this ticket on Scandinavian Airlines in Galena, Illinois at his home at 760 Dewey Ave. and paid for his ticket via Plaintiff's VISA credit card with the billing address of 760 Dewey Avenue.

13. On June 21, 2006, the day of departure, Plaintiff telephoned Scandinavian Airlines to inform them that Plaintiff was sick and unable to travel. Scandinavian Airlines Representative told Plaintiff that Plaintiff was not able to change this flight nor rebook at a later

time and failure to take the plane on June 21 would result in a "no show." Plaintiff wrote a letter to Mr. Sven Eric Persson on June 22, 2006 informing the airline again that Plaintiff was ill and could not take that flight and requested a refund or rebooked at another time. (EXHIBIT F) Plaintiff supplied Scandinavian Airlines with a note from his doctor, Dr. Greg Vandigo, Medical Associates, 219 Summit Street, Galena, Illinois dated June 21, 2006. (EXHIBIT G) Plaintiff was in the early stages of Lyme Disease and was sick for six months. Plaintiff never heard back from Scandinavian Airlines and never received the refund of $278.73 or the availability to rebook that flight at a later date.

WHEREFORE, Christian K. Narkiewicz-Laine, Plaintiff, is entitled to full reimbursement of the airline ticket (Dublin-Copenhagen-Helsinki on March 6, 2008), lunch, and hotel expense (EXHIBIT H) in the amount of $ 1,442.87 USD.

FURTHER, Plaintiff is also entitled to taxi fare from Helsinki Airport to the Hotel/Meeting Place in the amount of 40 Euro ($ 63.14); dinner of 90 Euro ($ 141.53) and breakfast of 40 Euro ($ 39.30) and return to Helsinki Airport by taxi of 35 Euro ($ 63.14) for the additional amount of $ 307.11. (EXHIBIT I)

FURTHER, Plaintiff is also entitled to two days of unnecessary parking at O'Hare Airport in the amount of $ 25.00 a day for a total of $ 50.00 and gasoline from O'Hare Airport to Galena in the amount of $ 65.00 for a total of $ 110.00.

FURTHER, Plaintiff is also entitled to two days of lost consulting fees from The European Centre for Architecture Art Design and Urban Studies (200 Euro x 8 hours x 2 days) for a total of 3,200 Euro $ 5,024.56. (EXHIBIT J)

FURTHER, Plaintiff will have to reschedule this meeting in Helsinki and is entitled to airfare, Chicago-Helsinki-Chicago (via Scandinavian Airlines) for a total ticket fare of $ 1,525.00.

FURTHER, Plaintiff is entitled to a refund of $278.73 from the unused ticket issued for June 21, 2006 due to illness and the inability to travel in 2006.

TOTAL AMOUNT OF EXPENSES AND LOST EARNINGS: $8,693.27.

FURTHER, Plaintiff is also entitled to 5,100 EURO ($6,524.59 USD) above and beyond the expenditure of unnecessary actual expenses for business loss due to the inconvenience of Scandinavian Airlines delay for both flights in accordance with laws inside the European Union. Ireland, actual place of the delay of journey, is a member of the EU.   European Law on this matter states:

1. There are no financial limits for death or bodily injury and the air carrier may make an advance payment to meet immediate economic needs of the person entitled to claim compensation;
2. In the case of destruction, loss of, or damage or delay to baggage, 1,000 Special Drawing Rights (approximately EUR 1,230) and, if the value of the baggage is greater than this limit, the carrier should be informed at check-in or ensure that is fully insured prior to travel;
3. In the case of delay to the journey, 4,150 Special Drawing Rights (approximately 5,100 EURO).

While the Plaintiff understands that a Court in the United States may or may not be able enforce European Union Law, Plaintiff asks this Court to grant this same remedy in the spirit of recognized laws and standards of liability; and for the Plaintiff's inconvenience and loss of business due to Scandinavian Airline's delays and for the unnecessary harassment of not honoring its commitment to refund the Plaintiff's demand to be reimbursed for hotel, meal, and transportation expenses related to the delays.

FURTHER, Scandinavian Airlines should be reprimanded for false, confusing, and misleading business practices by intentionally deceiving passengers to believe that they had booked a flight on Scandinavian Airlines when in fact the tickets were booked and purchased on another airline entirely. Plaintiff is certain that this "other" carrier (an unheard of company from Luxembourg) was the main cause for the delay on March 6, 2008 and the consequences experienced during this business travel.

FURTHER, Scandinavian Airlines is to be avoided at all costs for air transportation both trans-Atlantic and inside Europe. What once was a great airline has been reduced to the most insignificant and brutal and lowest form of air transportation. There is no customer service. The idea is to bleed customers out of every last Euro in their pocket. Agents in Copenhagen Airport are arrogant, rude, and downright nasty, particularly to Americans. The airline makes up rules as it goes along that are illegal ,and its customers are made to feel as if they have committed some kind of major infraction, when, again, in similar situations, it is the airline to blame. The use of strange air carriers in the case noted above is done to avoid Scandinavian Airlines' use of union pilots, flight attendants, and ground crew at the expense of its customers and again squeezing out every last Euro--even out of their employees. Not allowing a passenger to change a ticket who is seriously sick is dark, heartless, and dismal. It's a "take the money and don't provide anything in return" syndrome. Shame on this airline when good customer service meant greater marketing and promotion efforts that made customers feel they were important and essential and necessary to keep a great reputation and an even greater airline surviving.

CHRISTIAN K. NARKIEWICZ-LAINE

Ms. Angela R. Schlossmacher
Customer Relations
Scandinavian Airlines System
9 Polito Avenue
Lynhurst, NJ 07071
TEL: +800/345-9684

Exhibit    A





Scandinavian Airlines

Scandinavian Airlines

## Electronic Ticket Itinerary/Receipt

Mr Christian Narkiewiczlaine

Date of issue: 04MAR08
Place of issue: New York Ny
IATA number 31991013

### Booking Reference MJ8LU

| Flight/Date Class | Route Status | Departure Meal | Arrival | Latest Check-in | Terminal | Baggage allowance |
|---|---|---|---|---|---|---|
| **Scandinavian Airlines** SK538/06MAR M Economy Operated by Luxair | Dublin - Copenhagen Confirmed | 11.00 Food and Beverages for Purchase | 14.10 | 10.15 | | 20K |
| **Scandinavian Airlines** SK712/06MAR M Economy | Copenhagen - Helsinki Confirmed | 14.55 Food and Beverages for Purchase | 17.30 | 14.15 | 3 | 20K |

### Ticket no. 117-2113657330

| | | |
|---|---|---|
| Fare | 445.00 | USD |
| Tax | 39.64 | USD |
| Ticket Amount | 484.64 | USD |

Form of Payment: **Visa**

Form of identification at security and gate:   **Visa**

Endorsement/Restrictions:   **RESTRICTIONS MAY APPLY**

Org.No          **SE 902001-7720**

Special Info:

SCANDINAVIAN AIRLINES
9 POLITO AVENUE
LYNDHURST, NJ 07071 USA
SAS Reservations          800 221 2350
SAS EuroBonus             800 437 5807
SAS Web Address           www.flysas.com

LIMITS OF LIABILITY
The applicable limits of liability for your journey on a flight operated by a carrier of the SAS Group are as follows:
1.  There are no financial limits in respect of death or bodily injury;
2.  In respect of destruction, loss of, or damage or delay to baggage, 1,000 Special Drawing Rights per passenger (approximately EUR 1,230) and, if the value of your baggage is greater than this limit, you should inform the carrier at check-in or ensure that it is fully insured prior to travel.
3   For damage occasioned by delay to your journey, 4,150 Special Drawing Rights per passenger (approximately EUR 5,100).
If your journey also involves carriage by other airlines, you should contact them for information on their limits of liability.
Time limit for action: Any action in court to claim damages must be brought within two years from the date of arrival of the aircraft, or from the date on which the aircraft ought to have arrived.
Baggage claims: Written notice to the carrier must be made within 7 days of the receipt of checked baggage in the case of damage, and, in the case of delay, within 21 days from the date on which it was placed at the disposal of the passenger.
This notice is required by the European Community Regulation (EC) No. 2027/97 (as amended by Regulation (EC) No. 889/2002).
Carriage and other services provided by the carrier are subject to conditions of carriage, which are hereby incorporated by reference. These conditions may be obtained from the issuing carrier.
For complete text of all provisions applicable we refer to SAS General Conditions of Carriage for Passengers and Baggage at www.flysas.com. For the relevant rules regarding baggage allowances we refer to SAS Baggage Allowances at www.flysas.com.

Exhibit  B

Christian K. Narkiewicz-Laine
760 Dewey Avenue
Galena, IL 61036

via FAX +201/896-3735                                                APRIL 2, 2008

Customer Service
SCANDINAVIAN AIRLINES
9 Polito Avenue
Lyndhurst, NJ 07071

Dear Sir or Madam:

On March 6, I was sent by The European Centre for Architecture, Art, Design and Urban Studies
as a consultant to attend a meeting in Helsinki, Finland on the same day.

On March 4, I had purchased a ticket on SAS Airlines: Dublin to Copenhagen and then to
Helsinki.

When I arrived for the flight in Dublin Airport, I was expecting Scandinavian Airlines SK538.
Instead, it was NOT SAS Airlines, but another carrier.

That carrier was one hour and a half delayed leaving Dublin. When I arrived to Copenhagen, I
had already missed the connecting flight (SK712) to Helsinki.

By the time I arrived to Helsinki on SK1710 (again not SAS Airlines) it was 7:00PM. It should
have been 5:30PM. All people involved in the meeting in Helsinki had left their offices and went
home. I arrived too late.

I checked into a hotel in Helsinki hoping to reschedule the meeting for the following day, but,
unfortunately, the people I had been scheduled to meet with were not available.

When I purchased this ticket, I was led to believe that the carrier involved was SAS Airlines. It
was not. I also contracted with SAS Airlines an arrival time of 5:30PM, not 7:00PM. This
business trip was made for no reason.

I am attaching the receipt for the ticket in the amount of $484.64 and my hotel receipt in the
amount of 555.60 Euro ($888.96) plus 330 DK ($69.21) for lunch and for the full amount of
$1,442.87.

I expect to be reimbursed by SAS Airlines in the amount of $1,442.87, which does not included
other associated travel costs and my loss of business and time.

Sincerely yours,


Christian K. Narkiewicz-Laine

FAX THREE PAGES TOTAL:

Exhibit C



April 8, 2008


Mr. Christian Narklewicz-Laine
760 Devey Avenue
Galena, IL  61036

Dear Mr. Narkiewicz-Laine:

Thank you for your faxed letter dated April 2 regarding an irregularity experienced while enroute with SAS.

The present route Dublin-Copenhagen is a joint operation, between Scandinavian Airlines and LuxAir. As you are aware, many airlines today are engaged in similar co-operations, operating joint routes for the purpose of improving service for passengers connecting domestically to points beyond Scandinavia and Europe.

We are very sorry to learn that your trip was marred by the delay of your LuxAir Flight into Copenhagen causing you to miss your connecting flight 712 from Copenhagen to Helsinki. Our staff worked diligently to reaccommodate you on the next available flight to get you to your final destination as quickly as possible. In this case you were accommodated on Flight 1710 which arrived at 7:00PM local time.

Since you traveled and utilized your ticket, we are unable to honor your request for a refund of your ticket. Also the ticket purchased was a one way ticket and in this instance was considered your final destination, Helsinki, therefore, we are unable to honor your request for reimbursement of your hotel or meals.

We thank you for taking the time to write and express your disappointment with the service. Please be assured that a copy of your letter has been forwarded to the departments concerned for their review and future guidance.

We hope we shall have an opportunity of welcoming you aboard SAS in the future with better results.

SAS remains at your service.

Sincerely yours,

Angela R. Schlossmacher
Customer Relations

Exhibit D



May 16 2008


Mr. Christian K. Narkiewicz-Laine
760 Dewey Avenue
Galena, IL 61036

Dear Mr. Narkiewicz-Laine:

We are sorry to learn of your dissatisfaction with our previous reply to your correspondence.

Further to our original correspondence, as safety always comes first in our operation, and there are those inevitable occasions when a flight cannot be operated because of a technical malfunction of the scheduled aircraft. This was the case on March 6. Your original flight was delayed one hour until the necessary repairs could be made.

We offer our regrets that you missed a meeting. As a means of further explanation, the airline is not liable for meetings, which is considered consequential damages for which the airline has no liability. This information can also be found on our website under the Conditions of Carriage.

Mr. Narkiewicz-Laine, again we reiterate that it is regrettable that you have sustained a loss, however, our responsibility extends to all our customers and we must be consistent in our claims' resolution procedures. If you have private insurance, homeowner's credit card or other, we kindly request you place the claim with them.

SAS remains at your service.

Cordially,

Angela R. Schlossmacher
Customer Relations

Yahoo! | My Yahoo! | Mail | More

Welcome, **cknl2006** Sign Out | All-New Mail | Help

## YAHOO! MAIL
### UK & IRELAND  Classic

Search: [                    ]  [ Web Search ]



free

| Mail | Contacts | Calendar | Notepad |   | What's New? | Mobile Mail | Options |

[ Check Mail ]  [ Compose ]              [                    ]  [ Search Mail ]  [ Search the Web ]

Free inkjet cartridge!

Previous | Next | Back to Messages                    Mark as Unread | Print

[ Delete ]  [ Reply ]  [ Forward ]  [ Move... ]

**Folders**  [ Add - Edit ]

Inbox (727)

Drafts (5)

**Sent**

Spam (6)  [ Empty ]

Trash  [ Empty ]

**My Folders**  [ Hide ]

40 under 40 20... ...

delicious arch... (4)

DELICIOUS RECI...

DENMARK LAWYER

**EMAIL FORMS (6)**

EUROPEAN SPO...

FLIGHT INFORMA...

gaggenau

GD2007 CORREC...

**WEBSITE CHANG...**

**Search Shortcuts**

My Photos

My Attachments

Win a Blackberry!

Love Sport? Yahoo! Eurosport

Luxury London Hotel only £99!

Save on fitness

---

**sas**                                    Friday, 23 May, 2008 6:57 PM

From: "C narkiewicz" <cknl2006@yahoo.co.uk>

To: Illinoisman60193@yahoo.com

---

--- On Tue, 20/6/06, dontreply@sas.se <dontreply@sas.se>
wrote:

> From: dontreply@sas.se <dontreply@sas.se>
> Subject: Your travel plan
> To: "cknl2006@yahoo.co.uk" <cknl2006@yahoo.co.uk>
> Date: Tuesday, 20 June, 2006, 5:21 AM
> YOUR TRAVEL PLAN
>
> ...........................................
>
> OUTWARD FLIGHT:   SK4604, SCANDINAVIAN AIRLINES
> 22 June, 18:20, Dublin Dublin
> 22 June, 21:25, Oslo  Oslo Airport
>
> RETURN FLIGHT:   SK1467, SCANDINAVIAN AIRLINES
> 21 July, 13:20, Oslo Oslo Airport
> 21 July, 14:30, Copenhagen Copenhagen Apt Terminal 3
> RETURN FLIGHT:   SK2537, SCANDINAVIAN AIRLINES
> 21 July, 16:25, Copenhagen Copenhagen Apt  Terminal 3
> 21 July, 17:40, Dublin Dublin
>
> ...........................................
>
> Adult:                          236.00 USD
> Service fee:                      0.00 USD
> VAT:                              0.00 USD
> Tax:                             42.73 USD
>

sas – Sent – 'Yahoo! Mail'   Case 3:08-cv-50106   Document 11-2   Filed 08/11/2008   Page 12 of 17

5/26/08 7:35 P

equipments

```
> TOTAL PRICE:                          278.73 USD
>
>
> Booking reference:  2JWE83
> Travel contact:  +18152917896, cknl2006@yahoo.co.uk
>
> Visa will be charged 21 June 2006 and receipt sent to:
> Christian  Narkiewicz Laine
> 760 Dewey Avenue
> Galena Illinois 61036
> United States
>
> ..............................................
> PASSENGER(S)
> ..............................................
>
> Mr Christian Narkiewicz Laine
>
> Ticket type: E-ticket Visa
> Seat: No Seating
> Frequent flyer program:  None
>
> ..............................................
> NOTE! You must bring the E-ticket ID and present it at the
> airport, as this is your ticket.
> Also remember to bring a printed booking confirmation.
> ..............................................
>
>
> ..............................................
> SCANDINAVIAN DIRECT
>
> AVOID HASSLES. CHOOSE A SMARTER, EASIER WAY TO FLY
> ..............................................
>
> Forget paper tickets. Forget lines. If you travel regularly
> within Scandinavia
> we would like to help you glide effortlessly through
> airports.
>
> You can now decide how you would like to check in, on our
> website, by using
> our Self Service automats or if you like the traditional
> way you are always
> welcome to our counters. You can also get SMS updates about
> flight
> information.
>
> You can put your ticket on a credit card or any SAS card.
> Since it is already
> in your wallet, you will have one less thing to remember.
>
> And do not forget, if you plan ahead you can save up to 30
> percent on day- return business travel.
>
> ..............................................
> ENJOY YOUR FLIGHT!
```

Exhibit E



JUNE 22, 2006

### THE CHICAGO ATHENAEUM

via FAX +201/896-3735

Mr. Sven Eric Persson
Regional Manager
SCANDINAVIAN AIRLINES

FAXED

RE: 2JWE83

Dear Mr. Persson:

On Wednesday, June 21, I called SAS Airlines to inform your airline that I was in the hospital with an emergency illness and that I would not be able to take SAS #SK6604 from Dublin to Oslo on Thursday, June 22.

I was told by the SAS representative that I was not allowed to change this flight or rebook another flight and that I would be considered a "no show."

I was also told that the return flight #SK1467 from Oslo to Copenhagen and then #SK2537 from Copenhagen to Dublin on July 21 would also be invalid.

I am writing to protest this. I could careless what your policy is. Your airline cannot legally charge me for a ticket I cannot use.

Because of the emergency illness, I demand to either rebook those flights or refund my money completely.

I am attaching a note from my doctor to validate this claim.

My cell number is 815/291-7896 or FAX number 815/777-2471.

Sincerely yours,

Christian K. Narkiewicz-Laine
Director/President
THE CHICAGO ATHENAEUM

**FAX TWO PAGES TOTAL:**

*Exhibit G*

# ⓨ MEDICAL ASSOCIATES ✝ Mercy
### Galena Office

219 Summit Street
Galena, Illinois 61036
815-777-0900

Date 6/21/06

℞ For __Christian Narkiewicz__

Address _____

Christian was seen in
the office 6/12/06. He
has severe Gastroenteritii
& dehydration. He will need
☐ May substitute generic unless checked several days to recoop —

Greg Vandijon

M.D.

Refills:

| 0 | 1 | 2 | 3 | 4 | 5 | 11 |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |

This prescription may be filled at Pharmacy of your choice.

*Exhibit H*

Mr Christian Narkiewicz-Laine
760 Devey Avenue
Galena, IL61036
United States of America

## HOTEL KÄMP
*Helsinki*

**INVOICE**

| | |
|---|---|
| Page | : 1 of 2 |

Room: 706

| | |
|---|---|
| Invoice Number | : 394524 |
| Reservation N | : 536452083 |
| Date | : 08-03-08 |
| Cashier No | : 50 |
| Arrival | : 06-03-08 |
| Departure | : 08-03-08 |
| AR-Number | : |

Reference:

| Date | Description | Exch. Rate | Quant. | Price Net | Debit Net | Debit Gross | Credit |
|---|---|---|---|---|---|---|---|
| 06-03-08 | Accommodation | | 1 | 212.04 | 212.04 | 229.00 | |
| 06-03-08 | Charity - Unicef Donation | | 1 | 1.00 | 1.00 | 1.00 | |
| 07-03-08 | Accommodation | | 1 | 212.04 | 212.04 | 229.00 | |
| 07-03-08 | Cafe Kamp | | 1 | 30.82 | 30.82 | 37.60 | |
| 07-03-08 | Room Service | | 1 | 31.97 | 31.97 | 39.00 | |
| 08-03-08 | Communications Service | | 1 | 16.39 | 16.39 | 20.00 | |
| 08-03-08 | Visa | | 1 | 0.00 | 0.00 | | 555.60 |
| | XXXXXXXXXXXXX3857 | XX/XX | | | | | |

|  | Total EUR | | | | 504.25 | 555.60 | 555.60 |
|---|---|---|---|---|---|---|---|

**Balance EUR**   0.00

Gratuity _____

| | VAT | Net | Gross | |
|---|---|---|---|---|
| VAT 22% | 17.42 | 79.18 | 96.60 | EUR |
| VAT 8% | 33.93 | 424.07 | 458.00 | EUR |
| Total: | 51.35 | 504.25 | 555.60 | EUR |

Signature: _____  ID: _____

Your Starwood Preferred Guest 1211443 has been credited for this visit.



THE LUXURY COLLECTION
Starwood Hotels & Resorts

The Hotel Kämp is owned by Palace Kämp Group and operated under a license issued by Sheraton International, Inc.
Pohjoisesplanadi 29, 00100 Helsinki, Finland Tel +358 (0)9 576 111 Fax +358 (0)9 576 1122

Exhibit I



**☎ 0600 555 555**

*tilaukset@airporttaxi.fi • www.airporttaxi.fi*

40 €

# 455 55 55 RADIO-LINK TAXIS 455 55 55

| Date 06 / 03 / 08 | Time: AM PM | Waiting Time | | Drivers Code |
|---|---|---|---|---|
| Account Name: | | | Ref. No: | |
| Pick Up Point | | | | |
| Destination | | | Fare Total € 40 | |
| Credit Card | | Signature:......................................... | | |

*Exhibit K*

Christian K. Narkiewicz-Laine
760 Dewey Avenue
Galena, IL 61036

MAY 15, 2008

via FAX +201/896-3735 (CERTIFIED LETTER)

Ms. Angela R. Schlossmacher
Customer Service
SCANDINAVIAN AIRLINES
9 Polito Avenue
Lyndhurst, NJ 07071

Dear Ms. Schlossmacher:

I am in receipt of your letter dated April 8, 2008.

I reject your letter entirely and I demand immediate payment of $1,442.87 per my letter of April 2, 2008.

I give you seven (7) days to respond and no later than May 22.

If I do not hear from you by then, I will have my attorney file a lawsuit to recover this and other damages including my professional time.

Sincerely yours,

Christian K. Narkiewicz-Laine

**FAX ONE PAGE TOTAL:**

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| **CHRISTIAN K. NARKIEWICZ-LAINE** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 08 C 50106** |
| | ) | |
| v. | ) | **District Judge Reinhard** |
| | ) | **Magistrate Judge Mahoney** |
| **SCANDINAVIAN AIRLINES SYSTEMS** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Scandinavian Airlines Systems ("SAS"), for its Answer and Affirmative Defenses to

Plaintiff's Complaint, states as follows:

1.     Plaintiff Christian K. Narkiewicz-Laine is a resident of the City of Galena, Illinois
and in Jo Daviess County and resides at 760 Dewey Avenue, Galena, Illinois.

**ANSWER:**   SAS lacks knowledge or information sufficient to form a belief about the truth of

the allegations contained in Paragraph 1 of Plaintiff's Complaint.

2.     Scandinavian Airlines System (SAS) is a multi-national airline and owned by
SAS AB with operations and offices within the jurisdiction of the United States and in the State
of Illinois at O'Hare International Airport; the State of Washington at Seattle-Tacoma
International Airport; and the State of New Jersey at Newark Liberty International Airport at 9
Polito Avenue, Lyndhurst, New Jersey.

**ANSWER:**   SAS admits that it is an airline that operates internationally, and that it maintains

staff at O'Hare International Airport, Seattle-Tacoma International Airport, and maintains offices

at 9 Polito Avenue in Lyndhurst, New Jersey.  SAS denies the remaining allegations contained in

Paragraph 2 of Plaintiff's Complaint.

3.     On March 6, 2008, Plaintiff, as an independent consultant, was sent to Helsinki,
Finland by The European Centre for Architecture Art Design and Urban Studies in Dublin,
Ireland to attend a meeting with other European Museums regarding a joint-venture exhibition
inside Europe and the United States.  Plaintiff is the Museum President of The Chicago
Athenaeum:  Museum of Architecture and Design in Galena, Illinois, and often works as a
special consulting curator for other international institutions and on international projects.



EXHIBIT

B

**ANSWER:**    SAS lacks knowledge or information sufficient to form a belief about the truth of

the allegations contained in Paragraph 3 of Plaintiff's Complaint.

4.    Plaintiff purchased a ticket via Internet on Scandinavian Airlines (Flight #SK538) Dublin to Copenhagen and connecting on Scandinavian Airlines (Flight #SK712) Copenhagen to Helsinki in order to attend this meeting.

**ANSWER:**    SAS admits that a ticket was issued in Plaintiff's name for the travel described in

Paragraph 4. SAS lacks knowledge or information sufficient to form a belief about the truth of

the remaining allegations contained in Paragraph 4 of Plaintiff's Complaint.

5.    Plaintiff purchased this ticket on Scandinavian Airlines in Galena, Illinois at his home at 760 Dewey Ave. and paid for his ticket via Plaintiff's VISA credit card with the billing address of 760 Dewey Avenue. Plaintiff purchased and paid for the ticket on his own behalf.

**ANSWER:**    SAS lacks knowledge or information sufficient to form a belief about the truth of

the allegations contained in Paragraph 5 of Plaintiff's Complaint.

6.    Plaintiff arrived promptly at Dublin International Airport for the Scandinavian Airlines Flight #SK538, but found, after waiting over an hour inside the terminal, that the plane was delayed. The plane was delayed for almost an hour and a half because it had been delayed repeatedly during the day at other locations and was not following its scheduled arrival and departure times. There were other flights on other air carriers Dublin to Copenhagen and Dublin to Helsinki direct. No attempt was made by Scandinavian Airlines to rebook Plaintiff on another air carrier in order for the Plaintiff to make certain Plaintiff would make the connecting flight from Copenhagen to Helsinki or to arrive in Helsinki at the contracted time of 5:30PM.

**ANSWER:**    SAS admits that Flight 538 was delayed. SAS denies the remaining allegations

contained in Paragraph 6 of Plaintiff's Complaint.

7.    When Plaintiff finally boarded Scandinavian Airlines Flight #SK538, Plaintiff immediately realized that the air carrier was in fact NOT Scandinavian Airlines, but a mysterious "other" airline that the Plaintiff had never heard of. That carrier is NOT part of the Scandinavian Airlines System and not a subsidiary, but an entirely different company than Scandinavian Airlines. Plaintiff had no knowledge of this carrier; its ownership or safety or on-time record.

2

**ANSWER:**   SAS admits that Flight 538 was operated by LuxAir, as indicated on the tickets

attached to Plaintiff's Complaint. SAS denies the remaining allegations contained in Paragraph

7 of Plaintiff's Complaint.

8.      Because of the hour plus delay at Dublin Airport, Scandinavian Airlines Flight
#SK538 arrived late to Copenhagen causing Plaintiff to miss Plaintiff's connection
(Scandinavian Airlines Flight #712) to Helsinki. Plaintiff was rescheduled on (Scandinavian
Airlines Flight #1710) from Copenhagen to Helsinki. When Plaintiff boarded this aircraft,
Plaintiff understood again that this was not an aircraft belonging to the Scandinavian Airlines
System, but yet another mysterious carrier Plaintiff has never heard of.

**ANSWER:**   SAS admits that Plaintiff was provided air transportation from Copenhagen to

Helsinki aboard Flight 1710. SAS denies the remaining allegations contained in Paragraph 8 of

Plaintiff's Complaint.

9.      The plane finally landed in Helsinki at 7:00PM and not the 5:30PM contracted
time causing Plaintiff to entirely miss the meeting that Plaintiff had been sent for by the
European Centre for Architecture Art Design and Urban Studies to attend. By the time Plaintiff
arrived to the meeting destination all the participants had been dispersed. Although Plaintiff
tried to meet the following day, none of the participants were available. The entire trip was a
waste of Plaintiff's professional time and money.

**ANSWER:**   SAS admits that Flight 1710 arrived in Helsinki at 7:00pm local time. SAS

denies the remaining allegations contained in Paragraph 9 of Plaintiff's Complaint.

10.     On April 2, 2008, Plaintiff wrote a letter to Scandinavian Airlines asking for a
refund of the ticket in the amount of $484.64 and hotel in the amount of 555.60 Euro ($888.96)
plus 330 DK ($69.21) for lunch and for the full amount of $1,442.87). Scandinavian Airlines
rejected Plaintiff's request in a letter dated April 8, 2008 by Ms. Angela R. Schlossmacher,
Customer Relations.

**ANSWER:**   SAS admits the allegations contained in Paragraph 10 of Plaintiff's Complaint.

11.     Plaintiff sent another letter on May 15, 2008 again requesting to be reimbursed
with an answer to be given in seven days. Scandinavian Airlines sent another letter dated May
16, 2008 this time and now suddenly alleging "technical malfunction." Plaintiff overheard
ground crew in Dublin state that the airplane was delayed because "flight crew did not show up."
Scandinavian Airlines also suggested that Plaintiff investigate "private insurance" in order to
claim losses, which is absurd and a outright admission of Plaintiff's damages and the airline's
liability.

3

**ANSWER:**    SAS admits that Plaintiff sent a letter dated May 15, 2008 demanding payment

and threatening a lawsuit.  SAS admits that it responded via a letter dated May 16, 2008, wherein

SAS again declined to refund the cost of the ticket used by Plaintiff or for his hotel or meals, and

"kindly request[ed]" that Plaintiff place a claim with private insurance if applicable.  SAS denies

the remaining allegations contained in Paragraph 11 of Plaintiff's Complaint, and denies that

SAS has made any admissions of damages or liability whatsoever.

      12.    Additionally, on June 21, 2006, Plaintiff booked a ticket via Internet Dublin to
Oslo on Scandinavian Airlines (Flight #SK4604) with a return on July 21, 2006 Oslo to Dublin
(Flight #SK1467) in the amount of $278.73.  Again, Plaintiff purchased this ticket on
Scandinavian Airlines in Galena, Illinois at his home at 760 Dewey Ave. and paid for his ticket
via Plaintiff's VISA credit card with the billing address of 760 Dewey Avenue.

**ANSWER:**    SAS admits that a ticket was issued in Plaintiff's name for the travel described in

Paragraph 12.  SAS lacks knowledge or information sufficient to form a belief about the truth of

the remaining allegations contained in Paragraph 12 of Plaintiff's Complaint.

      13.    On June 21, 2006, the day of departure, Plaintiff telephoned Scandinavian
Airlines to inform them that Plaintiff was sick and unable to travel.  Scandinavian Airlines
Representative told Plaintiff that Plaintiff was not able to change this flight nor rebook at a later
time and failure to take the plane on June 21 would result in a "no show."  Plaintiff wrote a letter
to Mr. Sven Eric Persson on June 22, 2006, informing the airline again that Plaintiff was ill and
could not take that flight and requested a refund or rebooked at another time.  Plaintiff supplied
Scandinavian Airlines with a note from his doctor, Dr. Greg Vandigo, Medical Associates, 219
Summit Street, Galena, Illinois dated June 21, 2006.  Plaintiff was in the early stages of Lyme
Disease and was sick for six months.  Plaintiff never heard back from Scandinavian Airlines and
never received the refund of $278.73 or the availability to rebook that flight at a later date.

**ANSWER:**    SAS denies the allegations contained in Paragraph 13 of Plaintiff's Complaint.

      WHEREFORE, Defendant, SAS, denies that Plaintiff is entitled to any relief whatsoever

and prays for judgment in its favor and against Plaintiff, and for any additional relief this Court

deems equitable and just.

## AFFIRMATIVE DEFENSES

Defendant, SAS, for its Affirmative Defenses, states as follows:

### First Affirmative Defense

Plaintiff's claim is preempted by the Convention for the Unification of Certain Rules for

International Carriage by Air concluded at Montreal, Canada, May 28, 1999 (*reprinted* in S.

Treaty Doc., 106-45, CCH Av.L.Rep. ¶ 27, 400-59, 1999 WL 33292734), under which SAS is

entitled to exoneration to the extent it took all reasonable measures to avoid the damage or that it

was impossible to take such measures.

### Second Affirmative Defense

Plaintiff's claim is preempted by the Airline Deregulation Act, 49 U.S.C. § 41713, under

which Plaintiff can maintain no cause of action.

### Third Affirmative Defense

Plaintiff is entitled to no relief under SAS's Conditions of Carriage, which govern the

travel that is the subject of this litigation. (Ex. A, Conditions of Carriage).

### Fourth Affirmative Defense

The damages that Plaintiff alleges are not compensable damages under the law, and any

additional relief sought by Plaintiff, such as reprimand, is not recognized as appropriate relief in

civil actions.

### Fifth Affirmative Defense

To the extent any delay in Plaintiff's travel was attributable to SAS, such delay was the

result of SAS's compliance with safety standards, security standards, and/or governmental

regulations.

### Sixth Affirmative Defense

European Union law is inapplicable to Plaintiff's claim.

### Seventh Affirmative Defense

Plaintiff failed to mitigate his damages.

### Eighth Affirmative Defense

Any damages suffered by the Plaintiff resulted from acts and/or omission of other entities over whom SAS had no control or right of control.

### Ninth Affirmative Defense

The District Court for the Northern District of Illinois, Western Division, is not a convenient forum for this action.

### Tenth Affirmative Defense

SAS fully complied with all its obligations under the parties' bargains.


Respectfully submitted,

SCANDINAVIAN AIRLINES SYSTEMS

By:      s/Michael S. McGrory
One of Its Attorneys


Alan L. Farkas
Michael S. McGrory
Madsen, Farkas & Powen, LLC
20 S. Clark Street
Suite 1050
Chicago, Illinois 60603
T: (312) 379-3444
F: (312) 379-3443

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN K. NARKIEWICZ-LAINE | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 50106 |
| | ) | |
| v. | ) | District Judge Reinhard |
| | ) | Magistrate Judge Mahoney |
| SCANDINAVIAN AIRLINES SYSTEMS | ) | |
| | ) | |
| Defendant. | ) | |

## LOCAL RULE 3.2 STATEMENT OF AFFILIATES

Defendant, Scandinavian Airlines Systems ("SAS"), hereby states that the following

entities are SAS's publicly held affiliates, for purposes of Local Rule 3.2:

- SAS AB

Respectfully submitted,

SCANDINAVIAN AIRLINES SYSTEMS

By:      s/Michael S. McGrory
One of Its Attorneys

Alan L. Farkas
Michael S. McGrory
Madsen, Farkas & Powen, LLC
20 S. Clark Street, Suite 1050
Chicago, Illinois 60603
T: (312) 379-3444
F: (312) 379-3443

## Linda Gehrs

| | |
|---|---|
| **From:** | usdc_ecf_ilnd@ilnd.uscourts.gov |
| **Sent:** | Monday, June 23, 2008 10:13 AM |
| **To:** | ecfmail_ilnd@ilnd.uscourts.gov |
| **Subject:** | Activity in Case 3:08-cv-50106 Narkiewicz-Laine v. Scandinavian Airlines Systems answer to complaint |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** **Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### Northern District of Illinois - CM/ECF LIVE, Ver 3.2.1

## Notice of Electronic Filing

The following transaction was entered by McGrory, Michael on 6/23/2008 at 10:13 AM CDT and filed on 6/23/2008

| | |
|---|---|
| **Case Name:** | Narkiewicz-Laine v. Scandinavian Airlines Systems |
| **Case Number:** | 3:08-cv-50106 |
| **Filer:** | Scandinavian Airlines Systems |

**Document Number:** 6

**Docket Text:**
**ANSWER to Complaint *and Affirmative Defenses* by Scandinavian Airlines Systems (Attachments: # (1) Exhibit Statement of Affiliates)(McGrory, Michael)**

**3:08-cv-50106 Notice has been electronically mailed to:**

Alan L. Farkas    afarkas@vfrlitigation.com, lmgehrs@vfrlitigation.com

Michael Sweeney McGrory    MSMcGrory@vfrlitigation.com, lmgehrs@vfrlitigation.com

**3:08-cv-50106 Notice has been delivered by other means to:**

Christian K Narkiewicz-Laine
760 Dewey Avenue
Galena, IL 61036

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4933027-0
] [17cc25dbbab259af3a61c86f6420a841a98b3775ac879306bfa3df86124f710aff9
bce5805b93f64c138ca570a5207d6753f4f3d8c472319ef9c3b076f39c2af]]
**Document description:**Exhibit Statement of Affiliates
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4933027-1
] [9bd7937db96664eded10b04a1fb5c72e2aa6b96228346d210240f4142745b44f09c
8c1c9cb762a53be45290ad8de584ac6b19bc49cc9136a3055651434efba0e]]

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTIAN K. NARKIEWICZ-LAINE | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 50106 |
| | ) | |
| v. | ) | District Judge Reinhard |
| | ) | Magistrate Judge Mahoney |
| SCANDINAVIAN AIRLINES SYSTEM | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF JAMES P. BRENNAN

JAMES P. BRENNAN, Scandinavian Airlines System' Director of Finance and - Human Resources for the Americas, upon oath, states that if called before the Court to testify, upon personal knowledge, could confidently and competently testify as follows:

1.  My name is James P. Brennan, and I am of legal age to make this Affidavit, and all such facts are made upon my personal knowledge.

2.  I am presently employed by Scandinavian Airlines System ("SAS") as its Director of Finance and Human Resources for the Americas, and maintain my residence and office in New Jersey. I am familiar with Plaintiff's claims, SAS' corporate organization and structure, SAS' record-keeping procedures, SAS' operations and policies, SAS' Conditions of Carriage, and SAS' practice of contracting with other airlines to operate joint routes.

3.  Should this matter proceed to trial, I will be SAS' representative at trial.

4.  SAS maintains an office and staff at O'Hare International Airport in Chicago, Illinois ("O'Hare").

5.  SAS operates flights to and from O'Hare on a daily basis.



EXHIBIT
C

6.      SAS does not maintain any offices or staff in, or operate any flights to or from, any location that sits within the geographical area of the Western Division of the Northern District of Illinois.

7.      SAS is headquartered in Stockholm, Sweden. SAS maintains most of its records regarding ticket purchases, customer service, flight operations, and business records at either its Copenhagen, Denmark or its Stockholm headquarters. Some limited records pertaining to SAS' U.S. operations may be kept in New Jersey.

8.      To the extent records pertaining to Plaintiff's tickets, flights and claims exist, they are kept in either Copenhagen, Stockholm or New Jersey. Because SAS maintains an office in Chicago, such records will be more readily accessible in Chicago than in any place where SAS does not maintain an office.

9.      SAS does not maintain any records in the geographical area of the Western Division of the Northern District of Illinois.

10.      Angela R. Schlossmacher is an SAS customer relations representative who works in SAS' New Jersey office. She corresponded with Plaintiff, and investigated the reason for the delay of Plaintiff's flight. She is also familiar with SAS' policies and SAS' Conditions of Carriage.

11.      Sveneric Persson is SAS' Vice President – The Americas and works in SAS' New Jersey office. He corresponded with Plaintiff, and is also familiar with SAS' flight operations, the reason for Plaintiff's delay, the Conditions of Carriage, SAS' practice of contracting with other airlines to operate joint routes, applicable laws and regulations, and SAS' operations generally.

2

12.    Nancy Stellman works with SAS' Customer Relations department in SAS' New Jersey office. She is competent to testify with regard to the authenticity of relevant documents, such as tickets, boarding passes, correspondence, and the Conditions of Carriage.

13.    SAS has not yet completed its investigation of this matter, and anticipates that it will discover additional witnesses who will be able to testify with regard to the reason for the delay of Plaintiff's flight.

14.    SAS has conducted business in Chicago for several years. It flies into and out of Chicago, and has developed business relationships with ground transportation and lodging providers in Chicago. SAS has no similar connection to Rockford, or any other location within the Western Division of the Northern District of Illinois.

15.    If this matter is tried in the Eastern Division, SAS employees will have access to SAS' Chicago offices, where they will be able to perform their job duties, access certain SAS databases, and communicate with other SAS employees, offices and home. Such access will be unavailable in the Western Division.

16.    It will be more convenient for myself, for SAS employees residing in both Europe and New Jersey, and for SAS itself if this matter is litigated and tried in the District Court for the Northern District of Illinois, Eastern Division.

FURTHER AFFIANT SAYETH NAUGHT

**Verification**

I declare under penalty of perjury that the foregoing is true and correct, and I could competently testify to these matters if asked to do so.

August 11, 2008
Dated

James P. Brennan
Scandinavian Airlines System
Dir. Of Finance and Human Resources the Americas

3

## CHRISTIAN K. NARKIEWICZ-LAINE

**Christian K. Narkiewicz-Laine** (née Colorado, USA) is a
European/American architect, painter, writer, and poet.

He was educated in architecture at the Université de Strasbourg (1970-
1972), France and studied archaeology in Athens, Greece (1972-73). As a
student, he returned to the United States in 1973 and graduated from Lake
Forest College in Lake Forest, Illinois in 1975. In 1978, he became the
architecture critic for the Chicago Sun-Times until 1981; and in 1979, the
editor of Inland Architect. In 1981, he relocated to Europe and lived in Italy,
studying at The American Academy in Rome. In 1983, he returned to
Chicago and established Metropolitan Press Ltd., a small book publishing
company dedicated to architecture and design and the publisher of
Metropolitan Review, the Midwest's journal of architecture and art. He also
worked as a special architecture consultant to the Kennedy family, working
for Joseph P. Kennedy Enterprises in Chicago, New York, and Washington,
D.C. (1983-1988). He is presently the Director and President of The
Chicago Athenaeum since 1988.

He is the descendent of the Lithuanian/Russian noble families, Radziwill,
Kacuiciewicz, and Jodko-Narkiewicz. In the history of the Russian Empire,
this family produced many prominent politicians, generals, scientists, writer,
and artists. His grandmother was Sophia Gräfen Narkiewicz-Kacuiciewicz
(Doctor from St. Petersburg) and his mother was Charlotte Gräfen
Narkiewicz-Laine, founder of the Radzwill/Jodko-Narkiewicz Foundation, a
private family foundation dedicated to aid sick and underprivileged children
in Eastern Europe. Other prominent Lithuanian relatives include his
grandmother's sister, Michelina Gräfen Narkiewicz-Kacuiciewicz, Imperial
Nurse to Czarevich Alexis Nickolaevich at Alexander Palace in Tsasrakoe
Selo, and his grandmother's uncle, Piotr General Graf Narkiewicz of the
Czar's Imperial Army. He is also the great nephew of Dominik Prince
Radziwill (Mir, now Belarus); Jacob Graf Jodko-Narkiewicz (Russian
scientist and professor of Mme. Curie from Uzda, (now Belarus); and
Witold Jodko-Narkiewicz (founder of the Polish Socialist Party and the
modern State of Poland, Warsaw, Poland). In the United States, he is a
cousin to the late Jacqueline Kennedy Onassis and to the late John
Kennedy, Jr.

Awards: Architectural Critic's Fellowship from The Graham Foundation for
the Advanced Studies in the Fine Arts in 1980; "Chicago's 40 under 40
Achievers" by Crain's Chicago Business in 1991. The Goldsmith Award by
the Industrial Designers Society of America, 1993.

Curated Special Exhibitions: "New Chicago Architecture" (Milan, Italy,
1988); "New Chicago Skyscapers," Buenos Aires, Argentina, 1989); "New
Chicago Architecture" (Washington, D.C., 1990); "New Chicago
Skyscrapers" (Warsaw, Poland, 1991); "New Chicago Skyscrapers" (Milan,
1993); "New Chicago Skyscrapers" (Prague, Czech Republic, 1994); New
Chicago Skyscapers" (Budapest, Hungary, 1994); "New Chicago
Skyscrapers" (Thessaloniki, Greece, 1995) "New Chicago
Skyscrapers" (Kiev, Ukraine, 1995); "Frank Lloyd Wright in
Chicago" (Milan, Italy, 1996); "Frank Lloyd Wright in Chicago" (Lisbon,
Portugal, 1996); "Frank Lloyd Wright in Chicago" (Design Museum,
London, Great Britain, 1997); Frank Lloyd Wright in Chicago(Gothenburg,
Sweden, 1997); "Art to Swatch" (Chicago, 1995); "Art to Swatch" (Pacific
Design Center, Los Angeles, 1996); "American Architecture
Awards" (Thessaloniki, Greece, 1999); GOOD DESIGN Shows (1995,
1996, 1997, 1998, 1999, 2000, 2001; and "Children of
Chernobyl" (Chicago; Washington, D.C.; Madison, Wisconsin; Oslo,
Norway; Buckeberg, Germany; and Thessaloniki, Greece).

Books and Publications: He has authored essays and criticisms on
architecture, urbanism, and industrial design for numerous American,
European, and Japanese publications. He wrote three books: Landmark
Springfield (Metropolitan Arts Press, 1985); Helmut Jahn (A + U, Tokyo,
Japan, 1984); and Kiki Kogelnick (1998). He has lectured at universities
throughout the United States and South America. He taught architecture
history and aesthetics at the Illinois Institute of Technology. In 1997, his
first anthology of poetry, "Distant Fires" was published. Also, in 1999,





BALTIC HOURS



INSPIRATION
NATURE = POET

LOUIS H. SULLIVAN



EXHIBIT

"Inspiration: Nature and the Poet" (The Collected Poems of the Chicago
architect, Louis H. Sullivan). "Baltic Hours" (1999) offers poetic reflections
and verse from travels throughout Scandinavia and Eastern Europe and
has been republished in the Scandinavian countries, Belarus, and
Lithuania. His most recent books of poetry are "Greenland" (2003) and
"Apocryphal Writings" (2005).

His paintings, sculpture, and photography have been exhibited in the
United States and throughout Europe.

He resides in Chicago and Galena, Illinois and in Naxos, Greece.

GOOD DESIGN® is a registered trademark
of The Chicago Athenaeum: Museum of Architecture and Design.
All information and images on this website may not be used without the
permission of The Chicago Athenaeum.
The GOOD DESIGN logo was designed by Mort Goldshall in 1950.

website © 2001 The Chicago Athenaeum







*Dorothy Brown*

# Clerk *of the*
# Circuit Court
## Cook County

Case Information Summary for Case Number
2002-CH-06661

Filing Date: 4/2/2002
Division: Chancery Division
Ad Damnum: $0.00

Case Type: GENERAL CHANCERY
District: First Municipal
Calendar: 07

### Party Information

**Plaintiff(s)**
NARKIEWICZ LAIN
CHRISTIAN

**Attorney(s)**

CHAPMAN GERALD M

100 N LASALLE #2020
CHICAGO IL, 60602
(312) 263-6761

KARALIAS JOANNIS

**Date of Service**

**Defendant(s)**

MCCARTHY SONIA

**Attorney(s)**

SHADLE & ASSOCIATES LTD
1019 W WISE RD #200
SCHAUMBURG IL, 60193
(847) 891-3038

UNKNOWN OWNERS

NON RECORD CLAIMANTS

### Case Activity

EXHIBIT
tabbies®
*E*

Activity Date: 4/2/2002       Participant: NARKIEWICZ LAIN CHRISTIAN

GENERAL CHANCERY FILED

Court Fee: 220.00       Attorney: CHAPMAN GERALD M

Activity Date: 4/2/2002       Participant: NARKIEWICZ LAIN CHRISTIAN

CASE SET ON CASE MANAGEMENT CALL

Date: 9/13/2002       Judge: NOWICKI, JULIA M.
Court Time: 0915       Microfilm: CH000000000
Court Room: 2510

Activity Date: 4/23/2002       Participant: MCCARTHY SONIA

SUMMONS - RETD P.S.

Attorney: POLITES GREGORY E

Activity Date: 7/31/2002       Participant: NARKIEWICZ LAIN CHRISTIAN

CASE MGMT CALL NOTICE MAILED

Date: 9/13/2002       Judge: NOWICKI, JULIA M.
Court Time: 0915
Court Room: 2510

Activity Date: 9/13/2002       Participant: NARKIEWICZ LAI CHRISTIAN

GENERAL CHANCERY - DISMISSED FOR WANT OF PROSECUTION

Court Room: 2510       Judge: NOWICKI, JULIA M.
Microfilm: CH020602528

Activity Date: 9/12/2003       Participant: NARKIEWICZ LAIN CHRISTIAN

MOTION SCHEDULED (MOTION COUNTER ONLY)

Date: 9/19/2003       Attorney: POLITES GREGORY E
Court Time: 0915

Activity Date: 9/12/2003       Participant: NARKIEWICZ LAIN CHRISTIAN

***VACATE DWP(SET FOR MOTION HEARING)

Date: 9/19/2003       Attorney: POLITES GREGORY E
Court Time: 0915

Activity Date: 9/12/2003       Participant: NARKIEWICZ CHRISTIAN

AFFIDAVIT FILED

Attorney: POLITES GREGORY E

Activity Date: 9/12/2003                    Participant: NARKIEWICZ CHRISTIAN

CERTIFICATE OF MAILING FILED

Attorney: POLITES GREGORY E

Activity Date: 9/12/2003                    Participant: NARKIEWICZ CHRISTIAN

NOTICE OF MOTION FILED

Attorney: POLITES GREGORY E

Activity Date: 9/12/2003                    Participant: NARKIEWICZ CHRISTIAN

PETITION FILED

Attorney: POLITES GREGORY E

Activity Date: 9/19/2003                    Participant: MCCARTHY SONIA

FILE APPEARANCE OR JURY DEMAND, ANSWER OR PLEAD - ALLOWED -

Court Room: 2510                    Judge: NOWICKI, JULIA M.
                                   Microfilm: CH030592373

Activity Date: 9/19/2003                    Participant: MCCARTHY SONIA

TRANSFERRED TO PRESIDING JUDGE

Court Room: 2510                    Judge: NOWICKI, JULIA M.
                                   Microfilm: CH030592373

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAI CHRISTIAN

TRANSFERRED TO PRESIDING JUDGE

Court Room: 2403                    Judge: KINNAIRD, DOROTHY KIRIE
                                   Microfilm: CH030592373

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAI CHRISTIAN

DISCOVERY - ALLOWED -

Court Room: 2510                    Judge: NOWICKI, JULIA M.
                                   Microfilm: CH030592373

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAI CHRISTIAN

CHANGE OF VENUE - ALLOWED -

Court Room: 2403                    Judge: KINNAIRD, DOROTHY KIRIE

Microfilm: CH030593384

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAI CHRISTIAN

ORDER VACATING D.W.P.

Court Room: 2510                    Judge: NOWICKI, JULIA M.
Microfilm: CH030592373

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAIN CHRISTIAN

RETURN FOR RANDOM ASSIGNMENT

Judge: KINNAIRD, DOROTHY KIRIE
Microfilm: CH030593384

Activity Date: 9/19/2003                    Participant: NARKIEWICZ LAI CHRISTIAN

RETURN FOR RANDOM ASSIGNMENT

Court Room: 2403                    Judge: KINNAIRD, DOROTHY KIRIE
Microfilm: CH030593384

Activity Date: 10/22/2003                    Participant: MCCARTHY SONIA

APPEARANCE FILED - FEE PAID -

Court Fee: 140.00                    Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 10/22/2003                    Participant: MCCARTHY SONIA

CERTIFICATE FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 10/22/2003                    Participant: MCCARTHY SONIA

NOTICE FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 10/22/2003                    Participant: MCCARTHY SONIA

PROOF OF SERVICE FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 10/22/2003                    Participant: MCCARTHY SONIA

MOTION FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 11/18/2003        Participant: NARKIEWICZ LAI CHRISTIAN

### SET BRIEFING SCHEDULE - ALLOWED -

Court Room: 2405        Judge: JAFFE, AARON
       Microfilm: CH030732936

Activity Date: 11/18/2003        Participant: NARKIEWICZ LAI CHRISTIAN

### CASE SET ON PROGRESS CALL

Date: 1/13/2004        Judge: JAFFE, AARON
Court Time: 1000        Microfilm: CH030732936
Court Room: 2405

Activity Date: 1/5/2004        Participant: MCCARTHY SONIA

### CERTIFICATE OF MAILING FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 1/5/2004        Participant: MCCARTHY SONIA

### EXHIBITS FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 1/5/2004        Participant: MCCARTHY SONIA

### ANSWER TO COMPLAINT FILED

Attorney: SHADLE & ASSOCIATES LTD

Activity Date: 1/13/2004        Participant: NARKIEWICZ LAI CHRISTIAN

### MORTGAGE FORECLOSURE MOTION PLAINTIFF DISMISSED

Court Room: 2405        Judge: JAFFE, AARON
       Microfilm: CH040032178

---

Please note: Neither the Circuit Court of Cook County nor the Clerk of the Circuit Court of Cook County warrants the accuracy, completeness, or the currency of this data. This data is not an official record of the Court or the Clerk and may not be represented as an official court record.

If data does not appear in a specific field, we likely do not have the responsive data in our master database.

Return to Search Page

FILED

**DOCKETED**

JUN 2 5 2002

JUN 2 6 2002

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA    )
                            )    No.
        v.                  )
                            )    **02CR0627**
CHRISTIAN NARKIEWICZ-LAINE   )    Sections 2, 1001 and 1341

**JUDGE COAR**

COUNT ONE

MAGISTRATE SIDNEY I. SCHENKIER

The SPECIAL MARCH 2001 GRAND JURY charges:

1.    At times material to this indictment:

(a)  The Chicago Athenaeum Museum of Architecture and
Design (hereinafter the "Athenaeum") was a non-profit architecture
and design exhibition museum located at 6 North Michigan Avenue in
Chicago, Illinois. As part of its activities, the Athenaeum hosted
architectural, design, and cultural events for foreign governments.

(b)  Defendant  CHRISTIAN NARKIEWICZ-LAINE was the
Athenaeum's President, Director and chief curator, and responsible
for all day-to-day Museum operations, including all financial
operations such as hiring third-party vendors, receiving and paying
all bills and invoices, and all banking activities and
transactions.

(c)  The Royal Danish Consulate General (hereinafter the
"Consulate") was the official representative of the Government of
Denmark in Chicago, with offices at 875 North Michigan Avenue,
Chicago, Illinois. The Consulate was led by an Ambassador and
Consul General, and staffed by subordinate trade and export
officers.

**EXHIBIT**

**F**

(d)   In late 1995, defendant CHRISTIAN NARKIEWICZ-LAINE, acting on behalf of the Athenaeum, solicited the Consulate to sponsor an exhibition of Danish architectural and design items and products to be held at the Athenaeum.   After several months of discussion, the Consulate, on behalf of the Government of Denmark, agreed to sponsor a Danish architectural and design exhibition called "Denmark Through Design" in conjunction with, and to be held at, the Athenaeum. The Consulate agreed to solicit Danish corporate sponsors for the "Denmark Through Design" exhibition. With the assistance of defendant CHRISTIAN NARKIEWICZ-LAINE, in late 1995 and early 1996 the Consulate solicited and obtained the agreement of approximately 75 Danish corporations to participate in the "Denmark Through Design" exhibition by contributing Danish-designed products and items. The Consulate also solicited and obtained agreements from various Danish corporate exhibition contributors to fund the exhibition by making cash contributions of up to $10,000 to the "Denmark Through Design" exhibition.

(e)   The Consulate and the Athenaeum agreed through their respective representatives that the Athenaeum would hire third-party vendors to produce, promote, and provide services to the exhibition.   The Consulate and the Athenaeum further agreed that the Athenaeum would pay these third-party vendors initially from Athenaeum funds, present the invoices to the Consulate, and be

2

reimbursed from a joint checking account established by the parties for all legitimate expenses.

(f)    In April 1996 the Consulate and the Athenaeum established a joint checking amount in the name of "Denmark Through Design, c/o Royal Danish Consulate General" at the American National Bank and Trust Company of Chicago (hereinafter the "joint account"). All sponsorship contributions were to be deposited into this joint account (#18118941), and all expenses of the exhibition were to be paid from this account by reimbursing the Athenaeum for its initial payment of expenses and third-party vendor invoices. The joint account required two signatures on each check for funds to be disbursed: one signator on behalf of the Consulate, and one signator on behalf of the Athenaeum. Defendant CHRISTIAN NARKIEWICZ-LAINE was the authorized signator for the Athenaeum, and signed all checks disbursing funds from the joint account.

(g)    Between approximately May 1, 1996 and approximately November 29, 1996, approximately $158,500 in contributions obtained by the Consulate was deposited into the joint account. During this same time period, approximately $138,000 was disbursed from the joint account to the Athenaeum after defendant CHRISTIAN NARKIEWICZ-LAINE, acting on behalf of the Athenaeum, knowingly presented fraudulent and inflated invoices to the Consulate from third-party vendors who provided support and services for the exhibition.

2.    From on or about May 1, 1996 to on or about January 25, 1997, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHRISTIAN NARKIEWICZ-LAINE,

defendant herein, devised, intend to devise, and participated in a scheme and artifice to defraud and to obtain money and property from the Royal Danish Consulate by means of materially false and fraudulent pretenses, representations, promises, and omissions (herein referred to as "the scheme").

3.    It was part of the scheme to defraud that beginning in May 1996 and continuing until at least August 13, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE altered legitimate third-party invoices he received from vendors who provided legitimate goods and services to the exhibition by fraudulently increasing the amounts reflected on the legitimate invoices, and creating new invoices reflecting fraudulent amounts in order to create the false appearance that these invoices were created by third-party vendors, and represented legitimate amounts billed for goods and services provided by third party vendors.

4.    It was further part of the scheme to defraud that between May 1996 and August 1996, defendant CHRISTIAN NARKIEWICZ-LAINE presented to the Consulate for payment from the joint account to the Athenaeum approximately $54,263 in fraudulently increased or created third-party vendor invoices.

4

5.    It was further part of the scheme to defraud that defendant CHRISTIAN NARKIEWICZ-LAINE falsely told Consulate officials that the fraudulently altered or created invoices had been paid in full by the Athenaeum and that the Athenaeum was therefore entitled to full reimbursement.

6.    It was further part of the scheme to defraud that defendant CHRISTIAN NARKIEWICZ-LAINE fraudulently induced the Consulate to pay the Athenaeum approximately $54,263 from the joint account between June and November 1996 in reliance upon the fraudulently altered or created invoices he presented to the Consulate.

7.    It was further part of the scheme to defraud that in November 1996 defendant CHRISTIAN NARKIEWICZ-LAINE, without informing Consulate officials, demanded from three Danish corporate sponsors that they make their exhibition sponsorship payments directly to the Athenaeum, rather than to the joint account established for the "Denmark Through Design" exhibition.

8.    It was further part of the scheme to defraud that in November and December 1996 defendant CHRISTIAN NARKIEWICZ-LAINE received $8500 in checks made out to the Athenaeum from three Danish corporate sponsors and deposited these checks into the Athenaeum's bank account rather than into the joint account, and concealed this information from Consulate officials.

5

9.    It was further part of the scheme to defraud that on August 13, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE submitted two fraudulent invoices on Athenaeum letterhead (both invoices bearing the number 9691) to the Consulate, which invoices listed numerous fraudulently inflated or created items which defendant CHRISTIAN NARKIEWICZ-LAINE falsely represented had been submitted by third-party vendors to the Athenaeum, and paid by Athenaeum funds. Attached to these two Athenaeum invoices were the fraudulently altered or created third-party vendor invoices which defendant represented had been paid by the Athenaeum and for which he was seeking reimbursement to the Athenaeum from funds in the joint account. Defendant CHRISTIAN NARKIEWICZ-LAINE had fraudulently increased the actual face amount of these invoices by over $40,000.

10.    It was further part of the scheme to defraud that on August 21, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE met with representatives of the Consulate and demanded immediate payment of approximately $53,425 in third-party vendor invoices, including the fraudulently altered and created invoices attached to the two Atheneum invoices bearing Atheneum invoice number 9691; and further demanded that Consulate officials seek immediate payment of unfulfilled sponsorship pledges which had been made in the preceding months by seven Danish corporate sponsors of the "Denmark Through Design" exhibition, including:

|   | Bodum | $2,500 |
|---|---|---|
|   | Caprani Light | $1,000 |

6

| | | |
|---|---|---|
| . | DSB | $5,000 |
| . | Folle | $1,000 |
| . | Grundfos | $5,000 |
| . | Radiometer | $5,000 |
| . | Vilhelm Lauritzen | $5,000 |

11. It was further part of the scheme to defraud that on August 21, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE also faxed a letter to the Consulate demanding immediate payment of the $53,425.59 in invoices he had presented to the Consulate on August 13, 1996, and of $24,500 in sponsorship pledges from these seven Danish corporate sponsors.

12. It was further part of the scheme to defraud that Defendant CHRISTIAN NARKIEWICZ-LAINE caused Consulate Officer Niels Rasmussen to fax letters to all seven Danish corporations on August 22, 1996 requesting that the corporations fulfill their pledges by sending their sponsorship checks to the joint account of "Denmark Through Design."

13. It was further part of the scheme to defraud that pursuant to defendant CHRISTIAN NARKIEWICZ-LAINE's demands for payment of the third-party vendor invoices he presented to the Consulate on August 13, 1996, and to pay additional sums defendant CHRISTIAN NARKIEWICZ-LAINE represented as being due the Athenaeum, the Consulate paid the Athenaeum $73,300 from the joint account in October 1996, including over $40,000 for the fraudulent invoices defendant CHRISTIAN NARKIEWICZ-LAINE had created or altered.

14.  It was further part of the scheme to defraud that defendant CHRISTIAN NARKIEWICZ-LAINE caused the following Danish corporations to transmit checks to the Consulate for deposit in the "Denmark Through Design" joint account:

(a)  Vilhelm Lauritzen    $5,000    August 29, 1996

(b)  Grundfos    $5,000    August 30, 1996

(c)  DSB    $5,000    September 11, 1996

The Consulate deposited these three checks into the joint account in November 1996.

15.  It was further part of the scheme to defraud that, despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Radiometer on August 22, 1996 seeking payment of its $5,000 sponsorship pledge to the joint account, on September 13, 1996 defendant CHRISTIAN NARKIEWICZ-LAINE faxed Athenaeum invoice #96401 to Radiometer's U.S. subsidiary in Westlake, Ohio, demanding immediate payment of $5,000 from Radiometer America, Inc., for a purported advertisement in the "Denmark Through Design" Gallery Guide, and advising Radiometer to make its check payable to the Athenaeum.

16.  It was further part of the scheme to defraud that on approximately November 18, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE caused Radiometer America, Inc., to mail its check #0073448 in the amount of $5,000, payable to "The Chicago Athenaeum, 6 North Michigan Avenue, Chicago, Illinois 60602", to the Athenaeum.

8

Defendant CHRISTIAN NARKIEWICZ-LAINE deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Radiometer sponsorship funds owed to the "Denmark Through Design" joint account.

17.  It was further part of the scheme to defraud that, despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Bodum on August 22, 1996 seeking payment of its $2,500 sponsorship pledge to the joint account, on November 8, 1996 defendant CHRISTIAN NARKIEWICZ-LAINE faxed Athenaeum invoice #96401 to Bodum's U.S. affiliate in Racine, Wisconsin, demanding $2,500 from Bodum for its sponsorship of the exhibition, and advising Bodum to make its check payable to the Athenaeum.

18.  It was further part of the scheme to defraud that on approximately November 8, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE caused Bodum to mail its check #0057658, in the amount of $2,500 payable to the Athenaeum, to the Athenaeum. Defendant CHRISTIAN NARKIEWICZ-LAINE deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Bodum sponsorship funds owed to the "Denmark Through Design" joint account.

19.  It was further part of the scheme to defraud that, despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Caprani Light on August 22, 1996

seeking payment of its $1,000 sponsorship pledge to the joint account, on November 11, 1996 defendant CHRISTIAN NARKIEWICZ-LAINE faxed Athenaeum invoice #96402 to Caprani Light's U.S. affiliate in Elk Grove Village, Illinois, demanding $1,000 from Caprani Light for its sponsorship of the exhibition, and threatening legal action if payment were not made immediately to the Athenaeum.

20.  It was further part of the scheme to defraud that o    n approximately December 10, 1996, defendant CHRISTIAN NARKIEWICZ-LAINE caused Caprani Light, Inc., to  mail its check #3635, in the amount of $1,000 payable to the Athenaeum, to the Athenaeum. Defendant CHRISTIAN NARKIEWICZ-LAINE deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Caprani Light, Inc., funds owed to the "Denmark Through Design" joint account.

21.  It was further part of the scheme to defraud that between approximately May 1996 and January 25, 1997, defendant CHRISTIAN NARKIEWICZ-LAINE  defrauded  the  Royal  Danish  Consulate  of approximately $62,763, and unlawfully converted such funds to the Athenaeum's use, by submitting fraudulently altered or created invoices to the Consulate, receiving payment from the joint account for  such  fraudulent  invoices,  and  converting  Danish  corporate sponsorship funds to the Athenaeum's use.

22.  On or about December 10, 1996, at Elk Grove Village, in the Northern District of Illinois, Eastern Division, and elsewhere,

10

CHRISTIAN NARKIEWICZ-LAINE,

defendant herein, for the purpose of executing the above-described scheme and attempting to do so, knowingly did cause to be deposited in an authorized United States Postal Service depository and delivered according to the directions thereon, a letter from Caprani Light, Inc., of Elk Grove Village, Illinois, addressed to The Chicago Athenaeum Museum, 6 North Michigan Avenue, Chicago, Illinois 60602, containing Caprani Light Inc.'s check number 3635 in the amount of $1000 payable to the Athenaeum.

In violation of Title 18, United States Code, Sections 1341 and 2.

11

COUNT TWO

The SPECIAL MARCH 2001 GRAND JURY further charges that:

1.    The allegations of paragraphs One through Twenty-one of Count One are incorporated as though fully set forth herein.

2.    On or about January 19, 1997, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHRISTIAN NARKIEWICZ-LAINE,

defendant herein, for the purpose of executing the above-described scheme and attempting to do so, knowingly did cause to be deposited in an authorized United States Postal Service depository and delivered according to the directions thereon, a letter addressed to Carol's Event Staffing, 1828 West Addison, Chicago, Illinois 60613.

In violation of Title 18, United States Code, Sections 1341 and 2.

12

COUNT THREE

The SPECIAL MARCH 2001 GRAND JURY further charges that:

1.   On or about May 31, 2001, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere,

CHRISTIAN NARKIEWICZ-LAINE,

defendant herein, knowingly and wilfully, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, made materially false, fictitious, and fraudulent statements and representations, in that the defendant falsely told a Special Agent of the Federal Bureau of Investigation that he had not altered any third-party vendor invoices submitted to the Royal Danish Consulate by the Athenaeum related to the exhibition "Denmark Through Design" held at the Chicago Athenaeum Museum during 1996;

In violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

13

No.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA

vs.

CHRISTIAN NARKIEWICZ-LAINE

## I N D I C T M E N T

Violations:    Title 18, United States
Code, Sections 2, 1001 and
1341

A true bill,

_____
Foreman

Filed in open court this _____ day of ___**JUN 26 2002**___, A.D. 20__

**MICHAEL W. DOBBINS**

_____
Clerk

Bail, $ _____

PO 880.320

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# F I L E D

JAN 2**8** 200**3**

Judge David H. Coar
United States District Court

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) |
| | ) |
| CHRISTIAN NARKIEWCZ-LAINE | ) |

No.  02 CR 627
Hon. David H. Coar

*DOCKETED*
JAN 2 9 2003

### PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of

Illinois, PATRICK J. FITZGERALD, and the defendant, CHRISTIAN NARKIEWCZ-

LAINE, and his attorney, Wilson P. Funkhouser, is made pursuant to Rule 11 of the Federal

Rules of Criminal Procedure, and is governed in part by Rule 11(e) (1) (C), as more fully set forth

in Paragraph 15 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between

the United States Attorney and defendant regarding defendant's criminal liability in case 02 CR

627.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or

in any way waive or release any administrative or judicial civil claim, demand or cause of

action whatsoever of the United States or its agencies.  Moreover, this Agreement is limited

to the United States Attorney's Office for the Northern District of Illinois and cannot bind any

other federal, state or local prosecuting, administrative or regulatory authorities except as

expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the

1



EXHIBIT
G

3

Northern District of Illinois, and the defendant, CHRISTIAN NARKIEWCZ-LAINE, and his

attorney, Wilson P. Funkhouser, have agreed upon the following:

1.    Defendant acknowledges that he has been charged in the indictment in this case

with mail fraud in violation of Title 18, United States Code, Sections 1341 and 2, and making

false statements to an agent of the Federal Bureau of Investigation (FBI), in violation of Title

18, United States Code, Section 1001.

2.    Defendant has read the charges against him contained in the indictment, and

those charges have been fully explained to him by his attorney.

3.    Defendant fully understands the nature and elements of the crimes with which

he has been charged.

4.    Defendant will enter a voluntary plea of guilty to Count Three of the indictment

in this case.

5.    Defendant will plead guilty because he is in fact guilty of the charge contained

in Count Three of the indictment. In pleading guilty, defendant admits the following facts and

that those facts establish his guilt beyond a reasonable doubt:

A. Background and Fraudulent Conduct

The Chicago Athenaeum Museum of Architecture and Design (hereinafter the

"Athenaeum") was a non-profit architecture and design exhibition museum located at 6 North

Michigan Avenue in Chicago, Illinois. As part of its activities, the Athenaeum hosted

architectural, design, and cultural events for foreign governments. Defendant CHRISTIAN

NARKIEWICZ-LAINE was the Athenaeum's President, Director and chief curator, and

2

responsible for all day-to-day Museum operations, including all financial operations such as hiring third-party vendors, receiving and paying all bills and invoices, and all banking activities and transactions.

The Royal Danish Consulate General (hereinafter the "Consulate") was the official representative of the Government of Denmark in Chicago, with offices at 875 North Michigan Avenue, Chicago, Illinois. The Consulate was led by an Ambassador and Consul General, and staffed by subordinate trade and export officers.

In late 1995, defendant CHRISTIAN NARKIEWCZ-LAINE, acting on behalf of the Athenaeum, solicited the Consulate to sponsor an exhibition of Danish architectural and design items and products to be held at the Athenaeum. After several months of discussion, the Consulate, on behalf of the Government of Denmark, agreed to sponsor a Danish architectural and design exhibition called "Denmark Through Design" in conjunction with, and to be held at, the Athenaeum. The Consulate agreed to solicit Danish corporate sponsors for the "Denmark Through Design" exhibition. With the assistance of defendant CHRISTIAN NARKIEWCZ-LAINE, in late 1995 and early 1996 the Consulate solicited and obtained the agreement of approximately 75 Danish corporations to participate in the "Denmark Through Design" exhibition by contributing Danish-designed products and items. The Consulate also solicited and obtained agreements from various Danish corporate exhibition contributors to fund the exhibition by making cash contributions of up to $10,000 to the "Denmark Through Design" exhibition.

The Consulate and the Athenaeum agreed through their respective representatives that

3

the Athenaeum to produce, promote, and provide services to the exhibition. The Consulate and the Athenaeum further agreed that the Athenaeum would present invoices to the Consulate, and be reimbursed from a joint checking account established by the parties for all legitimate expenses.

In April 1996 the Consulate and the Athenaeum established a joint checking amount in the name of "Denmark Through Design, c/o Royal Danish Consulate General" at the American National Bank and Trust Company of Chicago (hereinafter the "joint account"). All sponsorship contributions were to be deposited into this joint account (#18118941), and all expenses of the exhibition were to be paid from this account by reimbursing the Athenaeum for its initial payment of expenses and third-party vendor invoices. The joint account required two signatures on each check for funds to be disbursed: one signatory on behalf of the Consulate, and one signatory on behalf of the Athenaeum. Defendant CHRISTIAN NARKIEWCZ-LAINE was the authorized signatory for the Athenaeum, and signed all checks disbursing funds from the joint account to the Athenaeum.

Between approximately May 1, 1996 and approximately November 29, 1996, approximately $158,500 in contributions obtained by the Consulate was deposited into the joint account. During this same time period, approximately $138,000 was disbursed from the joint account to the Athenaeum after defendant CHRISTIAN NARKIEWCZ-LAINE, acting on behalf of the Athenaeum, presented invoices to the Consulate which defendant CHRISTIAN NARKIEWCZ-LAINE represented as being legitimate invoices from third-party vendors who provided support and services for the exhibition, and who had been paid by the Athenaeum

4

from its own funds.

Beginning in May 1996 and continuing until at least August 13, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE altered legitimate third-party invoices he received from vendors who provided legitimate goods and services to the exhibition by fraudulently increasing the amounts reflected on the legitimate invoices, and creating new invoices reflecting fraudulent amounts he falsely claimed were billed by third-party vendors. Between May 1996 and August 1996, defendant CHRISTIAN NARKIEWCZ-LAINE presented to the Consulate for payment from the joint account to the Athenaeum approximately $54,263 in fraudulently increased or created third-party vendor invoices. Defendant CHRISTIAN NARKIEWCZ-LAINE falsely told Consulate officials that the fraudulently altered or created invoices had been paid in full by the Athenaeum and that the Athenaeum was therefore entitled to full reimbursement. Defendant CHRISTIAN NARKIEWCZ-LAINE fraudulently induced the Consulate to pay the Athenaeum approximately $54,263 from the joint account between June and November 1996 in reliance upon the fraudulently altered or created invoices he presented to the Consulate. Among the actions the defendant took were the following:

On August 13, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE submitted two fraudulent invoices on Athenaeum letterhead (both invoices bearing the number 9691) to the Consulate, which invoices listed numerous fraudulently inflated or created items which defendant CHRISTIAN NARKIEWCZ-LAINE falsely represented had been submitted by third-party vendors to the Athenaeum, and paid by Athenaeum funds. Attached to these two Athenaeum invoices were the fraudulently altered or created third-party vendor invoices for

5

which defendant was seeking reimbursement to the Athenaeum from funds in the joint account. Defendant CHRISTIAN NARKIEWCZ-LAINE had fraudulently increased the actual face amount of these invoices by over $40,000.

On August 21, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE met with representatives of the Consulate and demanded immediate payment of approximately $53,425 in third-party vendor invoices, including the fraudulently altered and created invoices attached to the two Atheneum invoices bearing Atheneum invoice number 9691; and further demanded that Consulate officials seek immediate payment of unfulfilled sponsorship pledges which had been made in the preceding months by seven Danish corporate sponsors of the "Denmark Through Design" exhibition, including:

| | |
|---|---|
| • Bodum | $2,500 |
| • Caprani Light | $1,000 |
| • DSB | $5,000 |
| • Folle | $1,000 |
| • Grundfos | $5,000 |
| • Radiometer | $5,000 |
| • Vilhelm Lauritzen | $5,000 |

On August 21, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE also faxed a letter to the Consulate demanding immediate payment of the $53,425.59 in invoices he had presented to the Consulate on August 13, 1996, and of $24,500 in sponsorship pledges from these seven Danish corporate sponsors.

Defendant CHRISTIAN NARKIEWCZ-LAINE caused Consulate Officer Niels Rasmussen to fax letters to all seven Danish corporations on August 22, 1996 requesting that the corporations fulfill their pledges by sending their sponsorship checks to the joint account

6

of "Denmark Through Design."

Pursuant to defendant CHRISTIAN NARKIEWCZ-LAINE's demands for payment of the third-party vendor invoices he presented to the Consulate on August 13, 1996, and to pay additional sums defendant CHRISTIAN NARKIEWCZ-LAINE represented as being due the Athenaeum, the Consulate paid the Athenaeum $73,300 from the joint account in October 1996, including over $40,000 for the fraudulent invoices defendant CHRISTIAN NARKIEWCZ-LAINE had created or altered.

In addition, pursuant to Consulate Officer Rasmussen's faxed requests of August 22, 1996, the following Danish corporations transmitted checks to the Consulate for deposit in the "Denmark Through Design" joint account:

- Vilhelm Lauritzen      $5,000 August 29, 1996
- Grundfos               $5,000 August 30, 1996
- DSB                    $5,000 September 11, 1996

The Consulate deposited these three checks into the joint account in November 1996.

In September and November 1996 defendant CHRISTIAN NARKIEWCZ-LAINE, without informing Consulate officials, demanded in writing from three Danish corporate sponsors that they make their exhibition sponsorship payments directly to the Athenaeum, rather than to the joint account established for the "Denmark Through Design" exhibition. In November and December 1996 defendant CHRISTIAN NARKIEWCZ-LAINE received $8500 in checks made out to the Athenaeum from three Danish corporate sponsors and deposited these checks into the Athenaeum's bank account rather than into the joint account,

7

and concealed this information from Consulate officials.

Thus, despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Radiometer on August 22, 1996 seeking payment of its $5,000 sponsorship pledge to the joint account, on September 13, 1996 defendant CHRISTIAN NARKIEWCZ-LAINE faxed Athenaeum invoice #96401 to Radiometer's U.S. subsidiary in Westlake, Ohio, demanding immediate payment of $5,000 from Radiometer America, Inc., for a purported advertisement in the "Denmark Through Design" Gallery Guide, and advising Radiometer to make its check payable to the Athenaeum. On approximately November 18, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE caused Radiometer America, Inc., to mail its check #0073448 in the amount of $5,000, payable to "The Chicago Athenaeum, 6 North Michigan Avenue, Chicago, Illinois 60602", to the Athenaeum. Defendant CHRISTIAN NARKIEWCZ-LAINE deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Radiometer sponsorship funds.

Despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Bodum on August 22, 1996 seeking payment of its $2,500 sponsorship pledge to the joint account, on November 8, 1996 defendant CHRISTIAN NARKIEWCZ-LAINE faxed Athenaeum invoice #96401 to Bodum's U.S. affiliate in Racine, Wisconsin, demanding $2,500 from Bodum for its sponsorship of the exhibition, and advising Bodum to make its check payable to the Athenaeum. On approximately November 8, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE caused Bodum to mail its check #0057658, in the amount of $2,500 payable to the Athenaeum, to the Athenaeum. Defendant CHRISTIAN NARKIEWCZ-LAINE

deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Bodum sponsorship funds.

Despite the fact that Consulate Officer Rasmussen had written and faxed the Danish corporation Caprani Light on August 22, 1996 seeking payment of its $1,000 sponsorship pledge to the joint account, on November 11, 1996 defendant CHRISTIAN NARKIEWCZ-LAINE faxed Athenaeum invoice #96402 to Caprani Light's U.S. affiliate in Elk Grove Village, Illinois, demanding $1,000 from Caprani Light for its sponsorship of the exhibition, and threatening legal action if payment were not made immediately to the Athenaeum. On approximately December 10, 1996, defendant CHRISTIAN NARKIEWCZ-LAINE caused Caprani Light, Inc., to  mail its check #3635, in the amount of $1,000 payable to the Athenaeum, to the Athenaeum. Defendant CHRISTIAN NARKIEWCZ-LAINE deposited this check into the Athenaeum's bank account, and concealed from the Consulate that he and the Athenaeum received the Caprani Light, Inc., funds.

Accordingly, between approximately May 1996 and January 25, 1997, defendant CHRISTIAN NARKIEWCZ-LAINE defrauded the Royal Danish Consulate of approximately $62,763, and unlawfully converted such funds to the Athenaeum's use, by submitting fraudulently altered or created invoices to the Consulate, receiving payment from the joint account for such fraudulent invoices, and converting Danish corporate sponsorship funds to the Athenaeum's use.

B. False Statements to the FBI

On May 31, 2001 defendant CHRISTIAN NARKIEWCZ-LAINE was interviewed by

9

a Special Agent of the FBI regarding the above-described fraudulent conduct, and knowingly and wilfully, in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, made materially false, fictitious, and fraudulent statements and representations, in that the defendant falsely told a Special Agent of the Federal Bureau of Investigation that he had not altered any third-party vendor invoices submitted to the Royal Danish Consulate by the Athenaeum related to the exhibition "Denmark Through Design" held at the Chicago Athenaeum Museum during 1996;

in violation of Title 18, United States Code, Section 1001(a)(2).

6.     The defendant acknowledges that for the purpose of computing his sentence under the U.S. Sentencing Guidelines, the fraudulent conduct set forth in paragraph 5 A above, to which he stipulates, constitutes relevant conduct under Section 1B1.3 of the Guidelines.

7.     For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a) Pursuant to U.S.S.G §§2B1.1(c)(3) and 2J1.2, the base offense level for this offense is level 12. Pursuant to U.S.S.G. §§1B1.3, 2B1.1(a), and 2B1.1(b)(1)(D), the offense level for the defendant's relevant conduct set forth in paragraph 5 A is also level 12.

(b) Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline 3E1.1, a two-level reduction in

10

the offense level is appropriate.

(c) Based on the facts known to the government, the defendant's criminal history points equal 0 and the defendant's criminal history category is I.

(d) The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

8.      Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

9.      Defendant understands the count to which he will plead guilty carries the following penalties:

(a) Count Three carries a maximum penalty of five years imprisonment and a maximum fine of $250,000, and any restitution ordered by the Court.

(b) Defendant understands that this count also carries a term of supervised

11

release of not more than three years, which the court may specify.

Therefore, the total potential sentence carried under the counts to which defendant will plead guilty is 5 years imprisonment and a $250,000 fine, a term of supervised release, as well as any restitution ordered by the Court.

10.     The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $50 on each count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $50 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11.     Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be

12

instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12. The defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction or the manner in which that sentence was determined, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any

13

collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

13.    Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

14.    Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

15.    This Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(e)(1)(C). That is, the parties have agreed that the defendant should be sentenced pursuant to USSG level 10. Other than the agreed USSG level, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed USSG level set forth, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(e)(2) and (4). If, however, the Court refuses to impose the agreed USSG level set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

16.    Regarding restitution, the parties acknowledge that the amount of restitution owed to The Royal Danish Consulate is $62,763 and that pursuant to Title 18, United States

14

Code, Section 3663A the Court must order defendant to make restitution in this amount, minus any credit for funds repaid prior to sentencing. The defendant understands that Title 18, United States Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing Guidelines set forth the factors to be weighed in setting a fine and in determining the schedule, if any, according to which restitution is to be paid in this case. The defendant agrees to provide full and truthful information to the Court and United States Probation Officer regarding all details of his economic circumstances in order to determine the proper restitution schedule according to which the defendant may be ordered to pay. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court. The parties agree that the defendant, personally and in his official capacity on behalf of the Athenaeum, shall take all steps necessary and required to release and relinquish any and all claim(s) he or the Athenaeum have on the remaining funds in the joint bank account still maintained at the American National Bank, and to pay all such funds to the Consulate as part of the restitution required in this case; and that defendant's restitution obligation shall be reduced by all such amounts paid to the Consulate from the remaining balance in the joint account.

17.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment.

18.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event

15

he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations, and the agreements the defendant has executed to extend the statute of limitations, on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

19.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

20.    Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

16

21.    Defendant acknowledges that he has read this Agreement and carefully reviewed

each provision with his attorney. Defendant further acknowledges that he understands and

voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:  1/27/03

PATRICK J. FITZGERALD
United States Attorney

CHRISTIAN NARKIEWCZ-LAINE
Defendant

WILLIAM R. HOGAN, JR.
Assistant United States Attorney

WILSON P. FUNKHOUSER
Attorney for Defendant

17